## IN THE UNTIED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>**JOHNSON DAIRY**, a Colorado Limited Liability Company, EIN 87-0703859,<br><br>Debtor. | Bankruptcy Case No. 09-10201-SBB (Chapter 11) |
| In re:<br><br>**JOHN D. JOHNSON**, SS# XXX-XX-2660,<br><br>Debtor. | Bankruptcy Case No. 09-10203-SBB (Chapter 11) |
| **ESTATES OF JOHNSON DAIRY, LLC, AND JOHN D. JOHNSON,**<br><br>Plaintiffs,<br><br>v.<br><br>**GREG BELL, TIMOTHY THISSEN, DANIEL W. AND SUSAN L. KRUSE, WILLIAM H. AND CAROL C. BELL, NEW FRONTIER BANCORP, AND NEW FRONTIER BANK,**<br><br>Defendants. | **Adv. Proc. No. _____** |

## COMPLAINT

The Estates of Johnson Dairy, LLC and John D. Johnson ("Plaintiffs"), by and through their attorneys, Allen & Vellone, P.C., state and aver as follows for their Complaint against the above-captioned Defendants:

### I.    INTRODUCTION

1.    The business behind Johnson Dairy, LLC ("Johnson Dairy") started as a small heifer-raising facility in what was a broken-down, old feed lot near Eaton, Colorado,

approximately thirteen years ago (JF Cattle Company).  As a result of the hard work and forward-thinking of John D. Johnson, Johnson Dairy has since grown into the locally respected and largest dairy in the State of Colorado.  Johnson Dairy currently produces 8 to 10% of all milk sold in Colorado.

2.     During the past thirteen years, Mr. Johnson maintained a special relationship of trust and confidence with his banker, Defendant Greg Bell ("Bell").  As Bell moved from bank to bank over the years (Kersey Bank, Weld County Bank, and New Frontier Bank), Mr. Johnson loyally maintained his business with Bell.  As Chief Lending Officer at New Frontier Bank ("NFB" or the "Bank"), Bell handled all loans made to Mr. Johnson and Johnson Dairy (collectively referred to herein as "Johnson").  Sadly, this relationship of trust and confidence resulted in Bell personally enriching himself, his fiancée's family, his parents, and a bank director, at the expense of Johnson.

3.     Within NFB, all lending actions taken with respect to Johnson were also considered and approved by the Bank's board of directors, including board member Timothy Thissen ("Thissen"), bank President and Chief Executive Officer, Larry Seastrom, and Chairman of the Board, Robert Bruner.

4.     Certain NFB board members had personal interests in financing Johnson, as they were positioned to personally receive substantial amounts of the same money.  For example, board member Thissen owned Thissen Development, LLC, a construction company that NFB encouraged Johnson to use to build his dairy barn with NFB loan proceeds, for a total cost of approximately $3 million.  Thissen was also party to a heifer-growing arrangement with Johnson, described in more detail below, which helped capitalize the Bank and personally enrich Thissen more than $1.5 million at the expense of Johnson.  Board member Robert Brunner

owned Northern Feed & Bean, the feed company from which Johnson purchased approximately $1.5 million in feed per year.

5.     In addition to personally enriching themselves, NFB's officers and directors had a professional interest in using Johnson and his credit to keep NFB in compliance with governing banking regulations while under intense regulatory scrutiny in 2008.

6.     As such, this matter arises out of the Defendants' inequitable and illegal conduct between 2003 and 2008 with respect to NFB's disguised financing of Johnson through "cow lease" arrangements, and NFB's conventional loans made to Johnson in 2008.  As more fully described below, such conduct included Defendants' illegally: (a) personally enriching themselves and circumventing banking regulations using "cow lease" arrangements with Johnson; (b) receiving substantial kickbacks related to financing Johnson; (c) tying the sale of approximately $1 million in New Frontier Bancorp stock to NFB's approval of a $5 million loan to Johnson; and (d) replacing $12 million of Johnson's existing financing with outside financing for the benefit of the Bank and to the detriment of Johnson.

7.     As a remedy for Defendants' illegal and inequitable conduct alleged herein and the damage Johnson has suffered and continues to suffer as a result of such conduct, Plaintiffs respectfully ask this Court for damages and to discharge or equitably subordinate Johnson's debt related to NFB's loans and cow lease arrangements.

## II.     PARTIES

8.     Johnson Dairy, LLC, ("Johnson Dairy") is a Colorado limited liability company, wholly owned by John D. Johnson.  Johnson Dairy's principal place of business is at 300 East 16th Street, #301, Greeley, Colorado  80631.  Johnson Dairy is a debtor in the first above-captioned bankruptcy.

9.      John D. Johnson ("Johnson") is a Colorado resident, who resides in Greeley, Colorado. Johnson is the debtor in the second above-captioned bankruptcy case.

10.      Defendant Greg Bell ("Bell") is a Colorado resident, who resides in La Salle, Colorado. During all relevant times, Defendant Bell was chief lending officer at NFB. Having served as banker for Johnson for approximately thirteen years (ten years at NFB), Defendant Bell had a special relationship of trust and confidence with Johnson. Pursuant to the FDIC's Cease and Desist Order issued December 2, 2008, Defendant Bell will have been removed from his position as Chief Lending Officer at NFB by March 2, 2009, but will remain as an agricultural loan officer. At all times herein, the conduct of Defendant Bell was within his actual or apparent authority as an agent/employee of Defendant New Frontier Bank.

11.      Defendant Timothy Thissen ("Thissen") is a Colorado resident, who resides in Greeley, Colorado. During all relevant times, Defendant Thissen was a board member of NFB. Defendant Thissen was also a party, personally, with Johnson to the heifer-growing agreement described below, which served as disguised financing from NFB to Johnson.

12.      Defendants Daniel W. and Susan L. Kruse (the "Kruses") are Colorado residents, who reside in Fort Collins, Colorado. They are parties to cow lease arrangements described below, which served as disguised financing from NFB to Johnson.

13.      Defendants William H. and Carol C. Bell (the "Bells") are Colorado residents, who reside in Prospect Valley, Colorado. They are the parents of Defendant Bell. They are also parties, personally, to a cow lease arrangement, which served as disguised financing from NFB to Johnson.

14.      Defendant New Frontier Bancorp, a Colorado Corporation, is the holding company for NFB. Its principal place of business is 2425 35th Avenue, Greeley, Colorado,

80634.  Defendant New Frontier Bancorp sold sixty-five shares of its stock to John D. Johnson for approximately $1 million in late June 2008, just before end of the second quarter.

15.     Defendant New Frontier Bank ("NFB"), a Colorado state banking corporation, has its principal place of business at 2425 35th Avenue, Greeley, Colorado, 80634.

### III.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(O).

15.     This Court is the proper venue for this action under 28 U.S.C. § 1409(a).

### IV.     FACTUAL ALLEGATIONS

**A.     NFB's Non-Compliance With Banking Regulations**

16.     U.S. banks are subject to certain federal and state banking regulations intended to secure depositors' money and maintain the capital market's integrity.  In basic terms, banks are required to maintain a certain amount of capital relative to the money they lend.  Banks are also subject to certain lending limits intended to protect depositors if one customer fails, limiting the amount of its capital a bank may lend to any one customer.

17.     Unbeknownst to the public, NFB was out of compliance with governing banking regulations for the past few years.  NFB had made a practice of aggressively lending money well beyond what its capital reserves permitted.  By 2008, NFB held past due loans and foreclosed real estate worth more than 100 percent of its capital.  NFB was also in violation of its lending limits.

18.     After uncovering NFB's regulatory violations, in February 2008, various state and federal regulatory authorities, including the Federal Deposit Insurance Corporation ("FDIC") issued a Memorandum of Understanding ("MOU") to NFB.  The MOU required NFB to come

into regulatory compliance, increasing capital on hand versus money loaned.  As a result, during 2008, NFB was under intense regulatory scrutiny as the regulators attempted to enforce the MOU.  As described below, NFB improperly used its customers, including Johnson, to attempt to increase capital and satisfy bank regulators in 2008.

19.     Despite the FDIC's issuance of the MOU, NFB remained in violation of banking regulations.  Finally, on December 2, 2008, the FDIC issued a Cease and Desist Order ("CDO"), which required the Bank to immediately cease the above practices and comply with regulations.  Among other things, the CDO requires the bank to: (i) immediately start operating with adequate capital protection and liquidity; (ii) reduce concentrations of credit; (iii) reduce dependence on short-term brokered deposits; (iv) improve supervision and loan policies and procedures; (v) charge-off bad debt; and (vi) correct inaccurately reported financials.

20.     The CDO also requires NFB to remove Larry Seastrom from his position as bank president and chief executive officer, and Defendant Bell from his position as chief lending officer.

21.     At the time of this filing, NFB has or is in the process of securing additional capital through private investor financing, and/or Toxic Asset Repurchase Program ("TARP") funds, and continues to operate.

**B.     Defendants' Illegal and Inequitable Cow Lease Agreements**

22.     In 2003, 2005, and 2006, Johnson sought to build a milk barn, expand on it, and build a new, larger milk barn, respectively.  NFB wanted to lend money to Johnson for each of the expansions; however, after the barn construction loan in June of 2003, NFB was already at its lending limits with respect to Johnson, given NFB's amount of capital on hand.

23.     Seeking ways to circumvent its regulatory limits and loan more to Johnson than it

would conventionally be allowed to loan, NFB facilitated a series of cow lease arrangements, including one "heifer-growing agreement."

24.     All of the cow lease arrangements generally worked as follows:  (a) First, a bank director, family member or friend of a bank officer, would put up a small amount of capital or collateral with NFB, and agree to serve as an "owner" or "lessor" in an outside agreement with Johnson; (b) Second, NFB would loan money to the "owner" or "lessor," at an interest rate of 8-9%; (c) Third, the "owner" or "lessor" would provide close to the same amount of money to Johnson to "buy" heifers or cows from Johnson; (d) Under the same or subsequent agreement, Johnson would lease back the same cows for a cost of approximately 8-9% more annually than what the "lessor" had paid and borrowed from NFB; (f) As such, Johnson would effectively borrow money from NFB paying double interest – interest to the "lessor" as well as interest on the lessor's loan from the Bank; (g) The cows would never leave Johnson's property, and the risk of death or disease, as well as all other incidents of ownership, remained with Johnson; (h) The right to depreciate, however, went to the "owner" or "lessor," resulting in an additional financial gain to the "owner" or "lessor," because his/her entire income would be offset and he/she would therefore pay no income tax on other, unrelated income during the term of the cow lease.

25.     Each cow lease agreement (a) was a disguised financing agreement intended to loan money to Johnson in contravention of banking regulations; (b) substantially enriched the "owner" or "lessor" to the detriment of Johnson; (c) included additional kickbacks to Defendant Bell; and (d) was substantially created and facilitated by Defendant Bell, as an agent of NFB.

   i)     **The 2003 Kruse Cow Leases**

26.     In 2003, when the price of heifers (pre-milking cows) was low, Johnson sought to build his first dairy barn in order to begin milking cows, as opposed to selling heifers at low

prices.  NFB desired to finance the barn construction.  As a result of the construction loan, however, NFB reached its lending limit with regard to Johnson, and was unable to loan additional funds necessary to fill the newly constructed barn with milk cows.  In order to solve this problem, Defendant Bell, as agent of NFB, drew up the first of the cow lease arrangements.

27.     The first "lessors" chosen by Defendant Bell were Defendants Daniel and Susan Kruse (the "Kruses"), who were the sister and brother-in-law of his fiancée, Brenda Frank. Defendant Bell shared a joint checking account with Brenda Frank at all relevant times.

28.     The first two cow lease agreements, drafted by Defendant Bell, were entered into on July 17, 2003 and November 28, 2003, between Johnson and the Kruses.  The second cow lease was an expansion on the first, increasing the number of "leased" cows and thereby increasing the financing to Johnson.

29.     NFB loaned the Kruses capital so that the Kruses could purchase a total of 2,280 milk cows from Johnson, who would in turn lease the same cows back from the Kruses for a monthly lease payment of $72,500.  On information and belief, the Kruses and/or Defendant Bell kept approximately $12,000 per month of this lease payment, with the remainder going to NFB to service NFB's note from the Kruses, with interest, made specifically for the cow lease arrangement with Johnson.

30.     All incidents of ownership, except depreciation, remained with Johnson.  The Kruses enjoyed depreciation of the cows, resulting in their paying no income taxes during the entire lease (2003 to present).

**ii.     The 2005 Kruse Cow Lease**

31.     In 2005, when Johnson sought to expand on his existing milk barn, NFB again desired to finance Johnson's expansion, but could not do so based on its regulatory lending

limits.  As a result, Defendant Bell revised and amended the above two cow lease arrangements between the Kruses and Johnson.

32.     The resulting agreement was the third cow lease arrangement drafted by Defendant Bell, and entered into on November 1, 2005 between Johnson and the Kruses.  One day earlier, on October 31, 2005, NFB had loaned the Kruses approximately $5.6 million, payable at $70,380 per month.  The cow lease agreement provided that Kruse would "lease" 3,780 dairy cows to Johnson, including the 2,280 that were the subject of the 2003 agreements, plus an additional 1,500 dairy cows from a combination of Johnson's existing inventory and other sources.  The November 2005 agreement provided Johnson would pay the Kruses $90,500 per month.  At the end of five years, Johnson could either (a) refinance or continue making lease payments to the Kruses, or (b) buy back the cows for $300 per head, or approximately $1.1 million, plus pay the balance and interest on the Kruse's note to NFB.  After the 10 year term of the lease, Johnson would own the cows automatically (for a $1 payment).

33.     The Kruse leases provided that (a) the cows never left Johnson's property, (b) Johnson was entitled to all milk from the cows, (c) Johnson owned all calves born of the leased cows, (d) all risks, including death or disease, were born by Johnson, and (e) Johnson was responsible for feeding the cows.  In other words, all substantive incidents of ownership remained with Johnson (only depreciation went to the "lessor").

34.     The cow lease agreements did more than serve as disguised financing arrangements by which NFB could loan money to Johnson in violation of regulatory limits.  The agreements also provided kickbacks to Defendant Bell and incentive payments to the Kruses, both at expense of Johnson.  For example, with respect to the 2005 Kruse lease, the difference between the Kruses' monthly payment on their monthly loan from NFB and Johnson's monthly

"lease" payment to the Kruses (the "spread") amounted to $20,000. The $20,000 per month spread was split between the Kruses and a joint bank account shared by Defendant Bell and his fiancée, Brenda Frank. The rest went to the Bank as payment, with interest, on the NFB loan to the Kruses. As a result, the Kruses and Defendant Bell (and his fiancée) would profit in the amount of approximately $2.4 million over the 10-year term of the lease, from Johnson. Johnson would pay all interest on the money the Kruses borrowed. The Kruses would also profit by paying no income tax as a result of taking the depreciation on the "lease" cows. Additionally, NFB would receive its 8 to 9% interest and initial loan fees, from Johnson, on its note to the Kruses.

### iii.    The 2007 Thissen "Heifer Growing Agreement"

35.    In 2006, when milk and heifer prices were again dropping, Johnson sought to build a new, larger milk barn (double 80 parlor) where he could milk 5,000 more cows. NFB agreed to lend Johnson the funds to build the barn in November 2006. Johnson began building the new barn in December 2006. It would take approximately six months to complete.

36.    In 2007, in the midst of the barn project, NFB failed to meet its loan commitments to Johnson, because it had reached its lending limits with Johnson and it did not have the needed capital to loan more money to Johnson. (NFB had promised Johnson that it would grow its capital during the year, allowing it to loan Johnson the required funds for new milk cows needed for the new barn.) As a result, Johnson was forced to sell several hundred head of heifers in late 2007, thereby losing future milk-cows, in order to pay operating bills (including loan payments to NFB).

37.    In conjunction with NFB's failure to meet its loan commitments to Johnson, and Johnson's resulting need for capital in the midst of the milk barn project, NFB, through

Defendants Bell and Thissen, arranged a new "heifer-growing agreement" with Johnson.

38.     The Thissen "heifer-growing agreement," again substantially created by Defendant Bell (with assistance by Thissen's attorney), was entered into March 1, 2007, between Johnson and Defendant Thissen.   Prior to its execution, NFB loaned Defendant Thissen approximately $7 to $7.5 million (approximately $5 million for the cattle "purchase," plus approximately $2.25 million for feeding over the life of the arrangement).   The "heifer-growing agreement" provided Thissen would "purchase" 3,500 heifers from Johnson.   (The number 3,500 was later negotiated to 6,330 and finally 5,000 heifers.)

39.     Thissen paid Johnson approximately $5 million for 5,000 heifers.   In return, the "heifer growing agreement" provided that Thissen would pay Johnson to feed the heifers for a term of 450 days (until the heifers matured into milking cows).   After that, the agreement contemplated that the parties would enter into a subsequent cow lease agreement, which was intended to contain terms similar to the Kruse lease detailed above, whereby Johnson would lease the cows from Thissen during the period they were milking. Upon transition to a lease, the "heifer growing agreement" called for a $50-per-head, one-time fee totaling $250,000 to be paid to Thissen. Then, Johnson's ongoing lease payment would be the cost of the NFB loan to Thissen, plus an amount to be negotiated for return on Thissen's initial capital output—i.e., Thissen's "spread."

40.     As opposed to Thissen's making regular feed payments to Johnson, the "heifer agreement" was amended on November 1, 2007 to change the number of heifers leased (in order to reduce the payments Thissen was making to Johnson to compensate for the feed under the "heifer growing agreement").   Later feed costs were rolled into a subsequent lease described below.

41.     The Thissen "heifer growing" agreement, like the Kruse "cow leases," provided that Johnson would bear all risks associated with the heifers, including death or disease.  The animals never left Johnson's property, and they all remained branded with Johnson's brand, indicating Johnson's ownership under Colorado law.

42.     Johnson decided to build "equity" in the Thissen lease-cows by feeding them on only $1 per day, instead of the normal feeding rates of $1.50 to $2.00 per day.  That way, they would go into the lease at $1,610 per head, when they were really worth $2,300 per head.  As a result, Johnson's monthly payment upon transition to a lease would be substantially lower, because Johnson had subsidized the feed cost of the heifers.  As explained below, however, Johnson would never benefit from the equity he had built into the heifers.

**iv.     The Bell Lease**

43.     Between late 2007 or early 2008, Defendant Thissen decided he "wanted out" of the arrangement with Johnson.  But the agreement did not provide a mechanism by which Thissen was able to exit the feeding arrangement without Johnson's consent.  There was only a provision whereby Johnson could exit by purchasing back the cows by paying an additional amount of $300 per head, or $1.5 million, in addition to the cost plus feeding amount.

44.     With access to Johnson's full financial condition by virtue of their positions as a bank officer and director, Defendants Thissen and Bell knew that Johnson did not have the funds to buy back the cattle under the agreement.  They also knew that during the same period (early 2008) NFB was again failing to meet its loan commitments to Johnson, forcing Johnson to use approximately 90% of its revenues from operations and sell an additional 1,500 head of heifers to pay bills, including payments on existing loans to NFB.  Based on this knowledge, obtained by virtue of their positions in the Bank, Thissen and Bell knew that Johnson would have no

option but to allow them to force Johnson into a new lease with another party at highly unfavorable terms.

45.     On information and belief, Thissen offered to pay Defendant Bell a kickback or finder's fee in the amount of 5% of Thissen's $1.5 million profit ($75,000) if Bell could find a new party to take over the arrangement and enter into a cow lease agreement with Johnson.

46.     Defendant Bell secured his parents, William and Carol Bell (the "Bells"), to enter into the cow lease with Johnson.

47.     Thissen and Bell forced Johnson to exercise his right under the agreement to purchase back the heifers at a $300-per-head penalty.  Defendants Thissen and Bell made this decision, with the Bank's approval, and the corresponding paperwork was drawn up without Johnson's willingness or permission.  In essence, Defendants Bell and Thissen forced Johnson into a transaction whereby Thissen would unreasonably profit in the amount of $1.5 million, at Johnson's expense.

48.     Again, Defendant Bell drafted the terms of the new cow lease arrangement.  It was entered into March 14, 2008 by the Bells.  Even though they put down insufficient collateral at the Bank, they received a new loan from NFB for approximately $9.8 million (enough to roll up the Thissen loan and pay an additional $1.5 million profit to Thissen).  Unbeknownst to Johnson, he was paying the Bells an 8 to 9% return (i.e., "spread") on equity they had not even put up with the Bank, in addition to paying the Bank's interest on the Bells' note.

49.     As part of the transaction, upon information and belief, Defendant Thissen paid the $75,000 finder's fee to the Bells, who in turn paid it to their son, Defendant Bell.

50.     At the same time, NFB was in dire straights because it was undercapitalized while subject to the MOU, nearing the end of the first quarter 2008, when it would have to show its

financial position to regulators.

51.     On information and belief, Thissen used $500,000 of his $1.5 million profit from the transaction to buy stock in New Frontier Bancorp, thereby allowing NFB to artificially inflate its capital position (with loaned funds) in order to withstand regulatory scrutiny.  Other bank directors similarly bought stock in order to capitalize the Bank sufficiently before quarter's end.

52.     In sum, Johnson's total indebtedness on the above-described cow lease arrangements is more than $15 million.

**C.      NFB's Illegal and Inequitable Conduct with Respect to Conventional Loans Made to Johnson**

   **i.      Illegal Tying of $5 Million Loan to $1 Million Stock Sale**

53.     As stated above, the FDIC placed NFB under an MOU in February 2008, putting tremendous pressure on NFB to finally comply with banking regulations.  And as set forth above, Defendants NFB, Thissen and Bell used Johnson at the end of the first quarter 2008 to finance a $500,000 stock purchase by Thissen, helping to capitalize the Bank before the end of first quarter 2008, when the regulators would otherwise see that NFB had insufficient capital relative to its loans, in violation of the MOU.

54.     At the end of the second-quarter 2008, NFB was under similar pressure to appease bank regulators who would again realize at quarter's end that the Bank was not in compliance with the MOU because it was undercapitalized.

55.     At the same time, in June of 2008, Johnson was in need of capital because NFB had failed its prior loan commitments, and Johnson's debt by virtue of the cow leases had mushroomed as a result of the actions of Defendants Bell and Thissen.  Therefore, the conditions were again perfect for NFB to improperly use Johnson to capitalize itself at end of quarter.

56.     Three days before quarter-end, on June 27, 2008, Defendant Bell offered Johnson

14

a $5 million loan, on the condition that Johnson use $1 million of that loan to purchase stock in Defendant New Frontier Bancorp.  This would allow NFB to artificially inflate its capital position (again, with loaned funds), in order to remain in compliance with banking regulations. Defendant Bell made it clear to Johnson that the purchase of the stock was a *quid pro quo* for the loan.

57.     Johnson was not given the option to decline, as the $1 million stock purchase was a condition of Johnson receiving the loan money, which he urgently needed for operations.

58.     Three days later, on June 30, 2008, Defendant Bell had Johnson sign papers which resulted in Johnson's purchase of 15,385 shares of stock in New Frontier Bancorp for $65 per share for a total purchase price of approximately $1 million.  One day later, on July 1, 2008, Johnson signed a promissory note to NFB for $5 million.

59.     As a result, Johnson is now liable for $1 million in principal, together with 7.5% interest thereon, relating to money never received by Johnson.

60.     Upon information and belief, NFB similarly tied loans to stock sales with approximately ten to twelve bank customers other than Johnson in order to raise the capital it needed at the end of second and third quarter 2008 to satisfy regulators.

    **ii.**    **Illegal Take-Out of $12 Million in Existing Financing for the Bank's Benefit**

61.     As stated above, while NFB was under regulatory scrutiny in the first and second quarters of 2008, NFB used Johnson to capitalize itself for regulatory purposes.  Similarly, at the end of the third quarter 2008, NFB again used Johnson for its own benefit, and to his detriment.

62.     Months earlier, in January 2008, Johnson had signed a promissory note to NFB in the amount of approximately $12.6 million.  The interest rate was 8.25%, the note was to be amortized over twenty-five years, and it was due in three years, January 2011.  The loan

proceeds were used to pay off prior loans.

63.     Although it was not in Johnson's interest, in August 2008, NFB arranged a take-out of $12 million of Johnson's $12.6 million loan, with AgStar Financial Services, in Minnesota.  NFB represented to Johnson that the take-out would be to his benefit because allowing AgStar to take-out NFB's loan to Johnson would free up NFB's lending limits with respect to Johnson.  Therefore, NFB said, it would then loan Johnson an additional $2-3 million.  NFB represented that the interest rate on the AgStar loan was to be 7%, the loan was to be amortized over twenty-five years, and the loan was due in five years.

64.     Johnson was badly in need of the $2-3 million in capital NFB had promised as a result of the AgStar take-out, therefore, he agreed.  NFB informed Johnson in August 2008 that the AgStar take-out had been approved.

65.     On September 22, 2008, nearing the end of the third quarter 2008, regulatory agents arrived at the Bank and began an ongoing, intense examination of the Bank.  The Bank was not in compliance with the MOU.

66.     In late October 2008, one day before the AgStar loan was to be funded, NFB contacted Johnson to say that the interest rate on the loan would be 0.7% higher than previously disclosed and the amortization five years shorter (twenty years), thereby increasing Johnson's monthly payment by $2,676 per month.

67.     Johnson protested.  In response, NFB officer Gary Hoffner and Defendant Bell called Johnson to persuade him to agree to the AgStar takeout, after which Gary Hoffner physically drove out to Johnson's property to literally beg Johnson to agree to the AgStar take-out.  Hoffner said NFB badly needed the deal to occur, because the Bank was under examination, and without this deal, NFB would remain out of compliance with regulations.

68.     Because of Johnson's special relationship of trust and confidence with NFB, he believed the Bank would loan him the $2 to $3 million after the AgStar take-out.  As a result, Johnson agreed to do as NFB asked.

69.     Defendants Bell and NFB had misled Johnson, however, and the $2 to $3 million Johnson thought he would receive as a result of the AgStar deal never arrived.

70.     Indeed, the AgStar take-out was orchestrated wholly for NFB's benefit – to keep NFB in regulatory compliance and provide it the added capital it needed to survive.  For Johnson, the take-out meant that his total cost of repayment of the loan was significantly higher than it would have been had he not agreed to the take-out.  There were additional loan covenants that had not been in the January 2008 note, including but not limited to pre-payment penalties, and a requirement that Johnson's wife, Dorothy, personal guarantee the note.

71.     The take-out was intended to benefit the Bank.  Johnson received no benefit from the take-out; rather it was wholly to his detriment.

## V.     CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF ANTI-TYING PROVISIONS OF
### FEDERAL BANK HOLDING COMPANY ACT
**(Against Defendant NFB)**

72.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

73.     The conduct of NFB described herein violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. §§1972(1)(A), (B), (C), and (D), in that the Bank engaged in unusual banking practices that constituted anti-competitive tying arrangements that benefitted NFB and injured Plaintiffs.  Such conduct includes, but is not limited to, the Bank

requiring Johnson to invest $1 million in the Bank's holding company as a condition or requirement of Johnson's obtaining the $5 million loan from the Bank in July of 2008.

74.     Said conduct of NFB was willful and wanton.

75.     By reasons of such violations, the Plaintiffs have been injured and harmed, and under 12 U.S.C. § 1975, they are entitled to recover against Defendant Bank three times such actual damages as they shall prove to have sustained, together with costs and disbursements, including reasonable attorneys' fees.

**COUNT TWO**
**BREACH OF FIDUCIARY DUTY**
**(Against Defendant NFB)**

76.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

77.     NFB owed a fiduciary duty to Johnson, which arose out of the following: (a) the special relationship of trust and confidence that existed between NFB and Johnson; (b) Johnson entrusting NFB to act for his benefit; (c) the influence NFB acquired over Johnson and its excessive knowledge, control, and growing dominance over Johnson's business; and (d) NFB's causing Johnson to relax the care and vigilance he would have ordinarily exercised in dealing with a stranger.

78.     Plaintiffs reposed a special trust and confidence in NFB; the trust was justified, and NFB both invited and accepted Johnson's trust.

79.     By engaging in the conduct described hereinabove, including, but not limited to, inducing and compelling Johnson to enter into commercially unreasonable agreements that were nothing more than disguised loan arrangements that required payments of unreasonable and improper amounts to various other Defendants, NFB breached its fiduciary duty to Johnson.

18

80.     Said conduct was willful and wanton.

81.     By reason of such breach of fiduciary duty, the Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, their costs of suit, and interest.

## COUNT THREE
## CIVIL CONSPIRACY TO BREACH FIDUCIARY DUTY
### (Against All Defendants)

82.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

83.     Defendant NFB was a fiduciary of Johnson, and as such, owed Johnson the duties of candor, loyalty and good faith.

84.     Each and every Defendant conspired with Defendant NFB in its breach of fiduciary duty to Johnson.  Specifically, Defendants Daniel W. and Susan L. Kruse conspired with Defendant Bell and NFB to enter into the various cow lease agreements described above, understanding and agreeing that said agreements were nothing more than disguised loan arrangements that contained improper and unreasonable payments to them and Defendant Bell in the form of commercially unreasonable spreads and improper kickbacks to Defendant Bell. Defendants Thissen and William H. And Carol C. Bell conspired with Defendant Bell and NFB to enter into the feed agreement and the cow lease agreement described above, understanding and agreeing that said agreements were nothing more than disguised loan arrangements that contained improper and unreasonable payments to them and Defendant Bell in the form of commercially unreasonable spreads and improper kickbacks to Defendant Bell.

85.     By inducing and compelling Johnson to enter into said agreements, NFB breached its fiduciary duty to Plaintiffs.

86.     Defendant Bell's solicitation and acceptance of the payments he received in

connection with said agreements is a criminal offense under CRS § 11-107-104.

87.     Said conduct of Defendants was willful and wanton.

88.     By reason of such conspiracy, the Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, their costs of suit, and interest.

## COUNT FOUR
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Defendants Timothy Thissen,
### Daniel W. and Susan L. Kruse, and William H. And Carol C. Bell)

89.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

90.     Defendant NFB owed Plaintiffs the fiduciary duties set forth herein, and Defendant NFB breach its fiduciary duty to Johnson.

91.     Defendants Bell, Timothy Thissen, Daniel W. and Susan L. Kruse, and William H. and Carol C. Bell aided and abetted Defendant NFB's breach of its fiduciary duties by knowingly and intentionally participating in or receiving the benefit of the various breaches described hereinabove.

92.     By reason of such aiding and abetting the breach of fiduciary duty, the Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, their costs of suit, and interest.

## COUNT FIVE
## FRAUDULENT CONCEALMENT
### (Against Defendants Bell and NFB)

93.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

94.     Defendants Bell and NFB concealed the true terms of disguised loan

20

arrangements, including spreads, kickbacks, and other payments, all of which would have been required to be disclosed under the Truth in Lending Act.

95.     Defendants Bell and NFB fraudulently concealed (a) the true amount of pecuniary benefit Bell, Thissen, the Kruses, and the Bells were receiving by virtue of the agreements, at the expense of Johnson; (b) that the Kruses, Thissen, and the Bells had placed insufficient collateral with the Bank on their loans related to the cow lease agreements, such that the return they were getting on their equity, at Johnson's expense, was unreasonably high; and (c) Defendant Bell was receiving kickbacks or pecuniary gain on the cow lease arrangements.

96.     Defendants Bell and NFB concealed these facts with the intent of creating a false impression of the actual facts in Johnson's mind, and with the intent that Johnson enter into agreements he otherwise may not have.

97.     Johnson entered into the cow lease agreements without knowing the above facts. Because defendants Bell and NFB concealed these facts, Johnson's reliance was justified.

98.     By reason of said fraudulent concealment, the Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, their costs of suit, and interest.

## COUNT SIX
## RESPONDEAT SUPERIOR AND/OR APPARENT AUTHORITY
### (Against Defendant NFB)

99.     Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

100.    At all relevant times herein Defendant Bell was both the employee of Defendant NFB, and acting within his actual or apparent authority.  As such, the acts or omissions of Defendant Bell are in law the acts or omissions of Defendant NFB.

101.    By reason of the conduct of Defendant Bell alleged above, the Plaintiffs have

been injured and harmed, and are entitled to recover against both Defendant Bell and Defendant

NFB, on the basis of respondeat superior and/or apparent authority, their actual damages, their

costs of suit, and interest.

## COUNT SEVEN
## NEGLIGENT SUPERVISION
### (Against Defendant NFB)

102.    Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71

above as if fully set forth herein.

103.    Defendant NFB owed Johnson a duty to adequately supervise Defendant Bell in

connection with his duties at NFB.  Defendant NFB breached that duty.

104.    By reason of such breach, the Plaintiffs have been injured and harmed, and are

entitled to recover their actual damages, their costs of suit, and interest.

## COUNT EIGHT
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Defendant Timothy Thissen)

105.    Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71

above as if fully set forth herein.

106.    A party performs a contract in good faith when his actions are consistent with the

agreed common purpose and with the reasonable expectations of the parties.  Although the

"heifer-growing agreement" between Johnson and Thissen gave both parties discretion as to

whether to enter into a subsequent cow lease, entering into a cow lease was the purpose of the

agreement.  The parties never contemplated (a) Thissen would not enter into a subsequent cow

lease; (b) Johnson would never benefit from having subsidized the feed cost of the heifers; and

(c) Thissen would personal take a $1.5 million profit from the deal.

107.    As such, Thissen breached the covenant of good faith and fair dealing by forcing

Johnson to exercise his $300/hear purchase rights under the "heifer-growing agreement," forcing Johnson into the Bell Lease, and taking a $1.5 million profit for himself.

108.    By reason of such breach, the Plaintiffs have been injured and harmed, and are entitled to recover their actual damages, their costs of suit, and interest.

**COUNT NINE**

**UNJUST ENRICHMENT**
**(Against Defendants Bell, Timothy Thissen,**
**Daniel W. and Susan L. Kruse, and William H. And Carol C. Bell)**

109.    Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

110.    As a result of the improper conduct of said Defendants described herein, they were unjustly enriched at Plaintiffs' expense under circumstances that would make it unjust for them to retain the benefit.   Defendants received a benefit at Plaintiffs' expense under circumstances, as more fully described above, that make it unjust for the Defendants to retain such benefit without commensurate compensation.

111.    Such benefits include the pecuniary benefit said Defendants received by virtue of the cow lease arrangements.

112.    As described above, Defendant Bell was a confidant of Johnson.

113.    By reason of such improper conduct, the Plaintiffs have been injured and harmed, and are entitled to recover those amounts that Defendants were unjustly enriched, their costs of suit, and interest.

## COUNT TEN
### ECONOMIC DURESS AND BUSINESS COMPULSION
#### (Against Defendant NFB)

114.   Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

115.   As described above, Johnson signed paperwork purchasing $1 million of bank stock in exchange for the $5 million loan as a result of economic duress and business compulsion.

116.   As described above, Johnson signed paperwork moving from the Thissen "heifer growing agreement" to the Bell cow lease agreement in March 2008 as a result of economic duress and business compulsion.

117.   In both instances, Johnson was faced with urgent financial difficulties, of which NFB was aware.  NFB took undue and unjust advantage of Johnson's economic distress and coerced Johnson into the various loan agreements referenced hereinabove.   Accordingly, Johnson was forced to comply with the improper demands of NFB to enter into said agreements, or suffer serious business loss.

118.   At every critical moment, NFB forsook its duty as Johnson's fiduciary and coerced Johnson into entering into commercially unreasonable and improper agreements.

119.   By reason of such improper conduct, the Plaintiffs have been injured and harmed and are entitled to be reimbursed by NFB for the economic costs of those commercially unreasonable agreements, their costs of suit, and interest.

## COUNT ELEVEN
### FRAUDULENT CONVEYANCE UNDER 11 U.S.C. §548(B)
#### (Against Defendant New Frontier Bancorp)

120.   Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71

above as if fully set forth herein.

121.    On June 30, 2008, Johnson purchased 15,385 shares of stock in New Frontier Bancorp for $65 per share for a total purchase price of approximately $1 million.  At the time Johnson purchased the stock, the stock's true value was not reasonably equivalent to the price paid.

122.    At the time of the purchase of said stock, Johnson was insolvent or was rendered insolvent thereby.

123.    As a result, the stock transaction was a fraudulent conveyance under 11 U.S.C. §548(B), and Plaintiffs are entitled to avoid such transfer.

## COUNT TWELVE

### DECLARATORY JUDGMENT UNDER 28 U.S.C. §2201
**(Against Defendants Daniel W. and Susan L. Kruse, and William H. And Carol C. Bell)**

124.    Plaintiffs reallege and incorporate by this reference paragraphs 1 through 71 above as if fully set forth herein.

125.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure and Rule 7057 of the Federal Bankruptcy Rules of Civil Procedure, Plaintiffs request a declaration from the Court that based on the facts fully set forth herein, that the cow lease arrangements entered into between Johnson and said Defendants are disguised financing arrangement, which are equivalent to a sale of the cows on installment, with a security interest taken back by said Defendants, which security interest was unperfected at the time Johnson and Johnson Dairy filed their petitions in bankruptcy, the result of which is that said Defendants are unsecured creditors, and Johnson and Johnson Dairy are the true owners of the cows referenced in such cow lease agreements.

## VI.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request that judgment be entered on their Complaint against

Defendants as follows:

a.     Actual, compensatory, and treble damages caused by Defendants in an amount to be determined at trial;

b.     Pre- and post-judgment interest, costs incurred, and reasonable attorneys' fees as authorized by law;

c.     Discharge of Plaintiffs' debt related to the illegal and inequitable conduct of Defendants described above; or in the alternative, equitable subordination of all loans made to Johnson by NFB based on Defendants' inequitable and illegal conduct described above;

d.     Discharge of Plaintiffs' debt related to the cow lease arrangements described above; or in the alternative, subordination of the related debt;

e.     A return to Plaintiffs of the $1 million paid to Defendant New Frontier Bancorp for the bank stock purchased by Defendant Johnson, together with all applicable interest thereon;

f.     A declaration that the cow lease arrangements entered into between Johnson and Defendants Daniel W. and Susan L. Kruse, and William H. And Carol C. Bell are disguised financing arrangement, which are equivalent to a sale of the cows on installment, with a security interest taken back by said Defendants, which security interest was unperfected at the time Johnson and Johnson Dairy filed their petitions in bankruptcy, and that, accordingly, said Defendants are unsecured creditors, and Johnson and Johnson Dairy are the true owners of the cows referenced in such cow lease agreements;

g.     Such other and further relief as the Court deems just and proper.

DATED this 25th day of February, 2009.

Respectfully submitted,

/s/Patrick D. Vellone
Patrick D. Vellone, #15284
Penny T. Platnick, #38276
Shelley Thompson, #39999
ALLEN & VELLONE, P.C.
1600 Stout Street, Suite 1100
Denver, CO 80202
Telephone: (303) 534-4499
pvellone@allen-vellone.com
sthompson@allen-vellone.com
pplatnick@allen-vellone.com

**ATTORNEYS FOR PLAINTIFFS**