UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JOHNSON DAIRY, LLC | ) | Case No. 09-10201-SSB |
| a Colorado Limited Liability Co. | ) | Chapter 11 |
| EIN: 87-0703859 | ) | |
| and | ) | |
| JOHN D. JOHNSON | ) | Case No. 09-10203-SBB |
| SSN: XXX-XX-2660 | ) | |
| Debtors. | ) | **Jointly Administered Under** |
| | ) | **09-10201-SBB** |

**HEARING BRIEF ADDRESSING LEGAL ISSUES RELATED TO DEBTORS' COMBINED MOTION TO (1) AUTHORIZE DEBTORS TO ENTER INTO CWT PROGRAM OUT OF THE ORDINARY COURSE OF BUSINESS; AND (2) AUTHORIZE DEBTORS TO SELL AND SLAUGHTER COW HERD FREE AND CLEAR OF LIENS AND ENCUMBRANCES**

Federal Deposit Insurance Corporation as Receiver for New Frontier Bank ("FDIC-R")[1], by and through its undersigned counsel, hereby submits its Hearing Brief Addressing Legal Issues Related to Debtors' Combined Motion to (1) Authorize Debtors to Enter into CWT Program Out of the Ordinary Course of Business; and (2) Authorize Debtors to Sell and Slaughter Cow Herd Free and Clear of Liens and Encumbrances (the "CWT Motion").

## I. INTRODUCTION

1. In the CWT Motion, Debtors request three separate forms of relief: (a) authority to submit a bid into and, if accepted, participate in the CWT Program; (b) authority to sell Debtors' dairy herd to a slaughter or packing facility at current market prices and to escrow, pending further order of this Court, the proceeds of such a sale; and (c) a determination prior to the Debtors' proceeding with the CWT Program that neither FDIC-R nor any other creditor holds any lien or other interest in the payment that will be received from CWT.

2. The FDIC-R supports the Debtors' participation in the CWT Program, as well as the Debtors' plans to sell the dairy herd and to escrow the proceeds of such a sale. As explained more fully below, however, a determination of the extent and priority of liens and interests, such

---

[1] On April 10, 2009, New Frontier Bank ("NFB") was closed by the State Bank Commissioner, by Order of the Banking Board of the Colorado Division of Banking, and the Federal Deposit Insurance Corporation was appointed as Receiver for NFB. As Receiver of NFB and by express operation of law, FDIC-R has assumed all rights, titles, powers, privileges, and operations of NFB. 12 U.S.C. §1821(d)(2). As such, FDIC-R stands in NFB's shoes and operates as its successor. 12 U.S.C. §1821(d)(2)(B). Once FDIC-R became Receiver for NFB, all of NFB's interests were transferred to FDIC-R. 12 U.S.C. §1821(d)(2). As such, FDIC-R now operates as NFB's successor-in-interest. 12 U.S.C. §1821(d)(2)(A).

as that requested by the Debtors, must be determined in a formal adversary proceeding. Further, to the extent the Court intends to make such a determination now, the FDIC-R asserts that it clearly holds a properly perfected security interest in any payment received from CWT—whether such payment constitutes proceeds, rents, or contract rights. Moreover, regardless of how one categorizes any payments received by Debtors from CWT, FDIC-R holds a properly perfected security interest in the cows that Debtors propose to sell pursuant to the CWT program and, accordingly, FDIC-R must be adequately protected under § 363(e) of the Bankruptcy Code before the cows can be sold.

## II. PROCEDURAL HISTORY

3. Johnson Dairy, LLC (the "Johnson Dairy") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on or about January 8, 2009.

4. John D. Johnson ("Mr. Johnson") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on or about January 8, 2009.

5. Johnson Dairy and Mr. Johnson's combined assets consist of ownership and the operation of a dairy and a feedlot in Weld County, Colorado (collectively the "Dairy Farm").

6. Each of the Debtors have continued in the management and possession of their business and affairs pursuant to 11 U.S.C. §§1107 and 1108.

7. A Creditors Committee has been appointed in this proceeding.

8. On or about July 21, 2009, Debtors submitted a bid ("Debtors' Bid") to the Cooperatives Working Together ("CWT") Herd Retirement Program (the "CWT Program"). Debtors' Bid, attached hereto as **Exhibit A**, lists Mr. Johnson as the milk producer and offers to sell Johnson Dairy's entire dairy herd. Through Debtors' Bid, Mr. Johnson also represents and warrants that he holds legal and beneficial title to the dairy herd. Exhibit A, § 4(d).

9. On July 22, 2009, Debtors filed the CWT Motion.

10. On July 28, 2009, the Court set an August 11, 2009 hearing on the CWT Motion.

11. On August 3, 2009, the Court ordered the Debtors and all objecting parties to file trial briefs or other memoranda of authorities on or before August 6, 2009.

## III. STATEMENT OF FACTS

**A.** Johnson Dairy's and Mr. Johnson's Obligations to FDIC-R

12. Prior to the commencement of its bankruptcy proceeding, Johnson Dairy obtained loans and other financial accommodations from New Frontier Bank ("NFB"). FDIC-R, which has since been appointed as receiver of NFB, has a properly perfected first priority lien and security interest in substantially all of Johnson Dairy's assets including without limitation, inventory, equipment, accounts, general intangibles, farm products, livestock, farm equipment,

and all products and proceeds thereof (the "Pre-Petition Collateral"). The Promissory Note and Security Agreement between Johnson Dairy and NFB contains the following provision:

> I give you a security interest in all of the Property described in this Security Agreement …now or in the future, wherever the Property is or will be located, and all proceeds and products from the Property (including but not limited to, all parts, accessories, repairs, replacements, improvements, and accessions to the Property)…Proceeds includes <u>anything acquired upon the sale</u>, lease, license, exchange, or other disposition of the Property; <u>any rights and claims arising from the Property</u>; and any collections and distributions on account of the Property." (Emphasis added.)[2]

13. Pursuant to the cash collateral orders entered in this case, the FDIC-R was granted replacement liens on all of Johnson Dairy's assets (the "Post-Petition Collateral") in connection with Johnson Dairy's use of FDIC-R's Pre-Petition Collateral.

14. As of January 8, 2009, there remained due and owing to the FDIC-R by Johnson Dairy the sum of $30,039,776.34 plus post-petition interest and attorneys fees to the extent they are allowable pursuant to the Bankruptcy Code (the "Pre-Petition Secured Debt").

15. Prior to the commencement of his bankruptcy proceeding, Mr. Johnson, the legal owner of the dairy farm real estate, obtained loans and other financial accommodations from NFB. In relation thereto, Mr. Johnson executed multiple deeds of trust on the dairy farm property for the benefit of NFB, which included the assignment of all leases and rents arising from the dairy farm property, explicitly including the following:

> Rents, issues and profits, including but not limited to, security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which [Mr. Johnson] may have that in any way pertain to or are on account of the use or occupancy of the whole or any part of the [dairy farm property]."

16. As of January 8, 2009, there remained due and owing to the FDIC-R by Mr. Johnson over $20,000,000 plus post-petition interest and attorneys fees to the extent they are allowable pursuant to the Bankruptcy Code.

**B.** <u>The CWT Program and Johnson Dairy's Planned Participation Therein</u>

17. In an effort to strengthen and stabilize milk prices, CWT has instituted the CWT Program. Essentially, in order to raise the price of milk in the short term, the CWT Program provides an incentive program to dairy producers to reduce the number of cattle producing milk.

---

[2] The loan documents between J.F. Cattle Co. and NFB (which cover the feedlot and livestock) contain similar language.

18. In order to participate in the program, dairy producers must prepare a bid for their herd, which is an estimate per hundredweight of the value of the herd less the slaughter value. Specifically, the bid form for the CWT Program states as follows:

> a. Producer hereby offers to sell Producer's entire dairy herd, including all milking cows and dry cows in accordance with the terms and conditions set forth in this Bid;
>
> b. If this Bid is accepted by CWT, Producer shall be obligated to sell the Cows for slaughter. Producer shall be entitled to retain all proceeds from such sale of The Cows;
>
> c. CWT shall pay Producer an amount … equal to the Bid Price specified above multiplied by Producer's Verified Total Milk Volume for the period from June 1, 2008 through May 31, 2009, in two installments – 90% upon verification of sale of the cows; and 10% plus interest twelve months after completion of the audit provided that neither the Producer nor the dairy facility, whether owned or leased, have been involved in the production and marketing of milk during that 12 month period.

See Exhibit A, §§ 1, 6, and 8. Accordingly, if CWT accepts Debtors' bid, and as soon as CWT verifies that the cows have gone to slaughter, Debtors[3] will receive 90% of the amount bid times Johnson Dairy's milk production for the period June 2008 through May 2009 (estimated by Debtors to be approximately $9 million) (the "Unconditional Payment"). This is in addition to the amount that Debtors would receive from the slaughterhouse for the sale of the cows (the "Slaughter Payment"). Debtors apparently concede that the Slaughter Payment is proceeds of the cows and subject to the security interest of various parties, including FDIC-R. A year later, if Mr. Johnson and Johnson Dairy do not become involved in the commercial production and marketing of milk within that year, Debtors would receive the remaining 10% plus interest (estimated by Debtors to be approximately $1 million) (the "Conditional Payment" and, together with the Unconditional Payment, the "CWT Payment").

19. In their CWT Motion, Debtors state that they plan to waive their right to the Conditional Payment and use the Unconditional Payment funds, received from CWT for the slaughter of the herd, to buy a new dairy herd.

## IV. ARGUMENTS AND AUTHORITIES

24. Debtors' CWT Motion requests an expedited determination by this Court that neither FDIC-R nor anyone else has a security interest in a potential Conditional and Unconditional Payment from CWT. FDIC-R asserts that such a determination is not possible for the following reasons:

(a) the Federal Rules of Bankruptcy Procedure, and applicable case law, mandate that a proceeding to determine the validity and priority of liens or interests in the Debtors'

---

[3] The bid submitted by Debtors shows John D. Johnson as producer and Johnson Dairy as the dairy. It is unclear, at this time, which of the Debtors is entitled to the Conditional and Unconditional Payments and in what proportion.

property, such as the CWT Payments, must be brought before the Court as an adversary proceeding, rather than through an expedited motion; or

(b) alternatively, to the extent the Court intends to make a determination at this juncture, FDIC-R has a valid interest in any and all payments arising out of Debtors' participation in the CWT Program. After all, every portion of the CWT Payment constitutes rents or proceeds of FDIC-R's collateral, contract rights, or general intangibles in which Debtors have granted FDIC-R security interests; or

(c) alternatively, even if a determination may be made at this juncture and the Court concludes that any part of the CWT Payment fails to fall within the scope of FDIC-R's collateral, FDIC-R's interest in the cows nevertheless must be adequately protected under 11 U.S.C. § 363(e) at the full market value of the cows, not simply the slaughter value.

**A.** As a Matter of Law, the Extent and Priority of Liens and Interests in the CWT Payment Must Be Determined in an Adversary Proceeding.

20. A contested matter, particularly a contested matter to be decided on an expedited basis, is not the proper procedural vehicle for determining the extent and validity of the FDIC-R's, or anyone else's interest, in the CWT Payment. Federal Rule of Bankruptcy 7001(2) unequivocally mandates that a proceeding to determine the "validity, priority, or extent of a lien or other interest in property" must be the subject of an adversary proceeding. Fed. R. Bankr. P. 7001(2).

21. Indeed, if the plain language of Rule 7001(2) was not clear enough, it should also be noted that courts have overwhelmingly concluded that a proceeding to determine the validity, priority, or extent of a lien or other interest in property must be brought through a complaint and adversary proceeding, not by motion practice. *See, e.g., First Assured Warranty Corporation*, 383 B.R. 502, 546-47 (Bankr. D. Colo. 2008) ("the Commissioner's Excuse Turnover Motion is in actuality 'a proceeding to determine ... [an] interest in property,' which must be brought as an adversary proceeding.); *In re Hearthside Baking Co., Inc*., 397 B.R. 899 (Bankr. N.D. Ill. 2008) (finding that adversary proceeding, rather than motion, was required to determine whether prepetition assignment of rights under insurance policy was absolute or not, for purpose of assessing validity, priority or extent of debtor's interest in policy). Moreover, due process requires that a determination of property interests, including the validity of a lien, must be subject to the procedural safeguards inherent in the federal rules of civil procedure as incorporated by the federal rules of bankruptcy procedure. *See, e.g., In re Mansaray-Ruffin*, 530 F.3d 230 (3rd Cir. 2008) (holding Bankruptcy rule requiring that lien validity be determined via adversary proceeding is "mandatory" and establishes right to specific process that must be afforded pursuant to due process principles); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures."). An expedited contested matter arising through motion practice does not comply with the above-described mandates.

22. Further, well-settled law aside, there is also no practical reason that an expedited determination is needed in this case. If the Debtors submit a bid to CWT and that bid is

accepted, the full CWT Payment can simply be placed in escrow until such time as the Court properly determines the extent, priority and validity of the liens and interests related thereto. As this Court is aware, an adversary proceeding is already pending in which the dispute as to ownership between Debtors, Kruse, and Bell and the validity, priority, and extent of FDIC-R's security interests in the Debtors' property are at issue. The resolution of the FDIC-R's security interest in the CWT Payment should occur within the currently pending adversary proceeding.

**B.** FDIC-R has a Valid Interest in the CWT Payment

23. Tellingly, Debtors' CWT Motion fails to cite to a single legal authority supporting Debtors' wishful suggestion that the CWT Payment is not encumbered by FDIC-R's security interest. This is because Debtors' assertion is contrary to black letter law. Specifically, the Bankruptcy Code, the UCC, case law in Colorado, as well as the actual agreements between FDIC-R and Debtors, make crystal clear that the CWT Payment is subject to the FDIC-R's security interest.

*CWT Payment Constitutes Proceeds*

24. The CWT Payment constitutes proceeds of FDIC-R's collateral. FDIC-R has a properly perfected security interest in the Debtors' dairy herd. Section 4-9-315(a) of the Colorado Revised States states that "[a] security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien."

25. The Security Agreement between NFB and Johnson Dairy specifically covers farm products, inventory, accounts, and livestock. A security interest in the cattle extends to proceeds generated from the sale of milk. *Mid-States Sales Co., Inc., v. Mountain Empire Dairymen's Assoc., Inc.,* 741 P.2d 342 (Colo. App. 1987). That interest is protected post-petition by § 552(b). *Smith v. Dairymen, Inc.*, 790 F.2d 1107 (4th Cir. 1986). Accordingly, FDIC-R has a security interest in the "proceeds" of the dairy herd and its milk production.

26. The definition of "proceeds" was expanded in the 2001 revisions to the UCC, which were adopted by the Colorado legislature. Specifically, among other things, "proceeds" are defined as:

> a. Whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
>
> b. Whatever is collected on, or distributed on account of, collateral;
>
> c. Rights arising out of collateral.

C.R.S. 4-9-102(64). The intent of the parties, as expressed in the Promissory Note and Security Agreement, matches what Article 9 provides. For example, as evidenced by the citation at paragraph 12 above, the Promissory Note and Security Agreement between Johnson Dairy and NFB mimic the Article 9 language almost verbatim, demonstrating a clear intent to invoke the full breadth of the new definition of proceeds.

27.     In the context of the foregoing, it's clear that without the dairy herd, there would be no right to participate in the CWT Program.  Further, the language in the CWT bid clearly indicates that the Unconditional Payment (a full 90% of the CWT Payment) is directly tied only to the slaughter of the cows, which are FDIC-R's collateral.  As Debtors have made abundantly clear in the CWT Motion, Debtors are entitled to the Unconditional Payment *even if* they use that payment to continue in the dairy business.  Accordingly, at the very least, the Unconditional Payment necessarily must be considered a payment acquired upon the "disposition of collateral," an amount "distributed on account of collateral," and a "right arising out of collateral." Arguably, even the Conditional Payment easily falls within this broad definition of proceeds.

28.     This conclusion is supported by the substantial case law.  Colorado law dealing with governmental wool incentive payments provides that a security interest extends into payments provided as incentives for the disposition of collateral.  In *In re Mahleres*, 53 B.R. 86, 87 (Bankr. D. Colo. 1985), the court considered whether payments made by the government to ranchers upon the sale of wool were "proceeds" of the secured lender's collateral.  The Court held that they were.  The Court noted that the payments were incentives by the government to promote the cultivation of sheep and that the payments were keyed to the actual price the rancher received for the wool sold.  *Id.*  Additionally, the wool incentive payments came as a result of the Debtor's sale of wool and "without the sale of wool, there would be nothing at all paid to the debtor." *Id.*  In the present case, the CWT Payment is directly tied to the disposition of the herd, and without the sale of the herd for slaughter, there would be nothing at all paid to Debtors.  Accordingly, consistent with the Court's prior ruling in *Mahleres*, the CWT Payment must be considered as proceeds of FDIC-R's collateral.  *See also In re Patsantaras Land & Livestock, Co.*, 60 B.R. 24 (Bankr. D. Colo. 1986) (wool incentive payments which may be considered a form of "price support" are "proceeds" of collateral).

29.     Additionally, several courts across the country have analyzed a secured creditor's interest in payments made by the federal government to dairy farmers under the Dairy Termination Program (the "DTP"), which may provide some guidance.

30.     For example, the federal court in *FMB-First Michigan Bank v Van Rhee*, 681 F. Supp 1264 (W.D. Mich. 1987) applying Michigan law, held that DTP payments are the "proceeds" of a farmer's dairy business under the older, less expansive definition of "proceeds" in the pre-2001 Uniform Commercial Code.  The court reasoned that to the extent the payments may fairly be characterized as a substitute for income the farmer would have received absent participation in the program, or to the extent such payments are compensation for the difference between the market value and the slaughter value of the dairy herd, that they must be considered an exchange for the disposition of the secured lenders' collateral.  *Id.* at 1268.  The court pointed out that DTP payments (like the CWT Payment in our case) are made in exchange for an agreement to slaughter or export currently owned livestock. *Id.* at 1267.  The court added that the DTP payments are based on a bid per hundred weight of milk and the base amount of milk marketed by the farmer (again like the CWT payment in our case).  *Id.*  The court reasoned that a farmer's decision to participate in the program would, therefore, take into account both the value of the farmer's livestock, at least to the extent it differs from the slaughter value, and the income the farmer would have derived from the sale of the milk produced but for participation in the program.  *Id.*  Accordingly, the court determined that the DTP payments were "proceeds" of the dairy herd.  *Id.*

31.     Similarly, in *Rainier Nat. Bank v Bachmann*, 757 P.2d 979 (Wash. 1988), the Washington Supreme Court held that DTP payments are a substitute for an income-producing dairy herd, and are within the all-encompassing statutory definition of "proceeds" in § 9-306 of the Uniform Commercial Code, since the payments represent whatever is received upon disposition of the cattle. The court pointed out that the DTP requires the farmer to sell for slaughter or for export all of the farmer's dairy cattle, and to agree that for 5 years he or she will not acquire any interest in dairy cattle or in the production of milk or make available the milk production facilities that are otherwise available. *Id.* at 981. The court noted that a security interest in a dairy herd, together with the product and proceeds thereof, contemplates an interest in more than the individual cows because the herd represents a continuing source of production resulting in a repetitive income flow. *Id.* at 981-82. The court concluded that disposition of a dairy herd under the DTP is within the phrase "or other disposition" in § 9-306(1), which necessarily anticipates the herd being disposed of in some manner other than by sale. *Id.* at 982. The court added that the statute evidences an intent to include more than the usual cash proceeds received in a normal sale of the collateral. *Id.* Although the farmer will receive from the program more than the equivalent cash value of the dairy herd, the court said that the sale of the herd for slaughter is a disposition within the statute, and the DTP payments are within the common meaning and understanding of the phrase "whatever is received upon disposition." *Id.* The court observed that the method of calculating the DTP payment indicates that it is more than compensation for the slaughter value of the cows, it reflects the value of a producing dairy herd. *Id.*

32.     Again, the Washington Supreme Court came to this conclusion under the definition of "proceeds" under the old version of the UCC. Given that the definition of "proceeds" was expanded in 2001 and that this expansion was adopted by Colorado, it is even more logical for the CWT Payment to fall under the expanded definition. As discussed above, not only are the payments provided upon "disposition" of the dairy herd, they must also be considered "rights" arising from the dairy herd and amounts "distributed on account of" the dairy herd. *In re Wiersma*, 324 B.R. 92 (B.A.P. 9th Cir. 2005), *rev'd on other grounds,* 483 F.3d 933 (9th Cir. 2007) (Because of the expanded definition contained in Revised Article 9, proceeds should be given the broadest possible interpretation).

33.     To be sure, some courts have held that DTP payments were *not* proceeds of a dairy herd. These cases, however, are easily distinguishable from the case at hand. First, these courts based their decision upon aspects of the DTP government program that are not implicated by the CWT Program.

34.     In *Bank of North Arkansas v. Owens*, the Eighth Circuit noted that its analysis must begin by thoroughly examining the government program involved and described the program as follows:

> First, the individual producer is totally barred from the dairy business during the contract period. This ban extends to his immediate family, and forbids the acquisition of any personal interest in any phase of the milk production process. *See* 7 C.F.R. § 1430.457(b) (1988). Second, the equipment and facilities of the contractor are prohibited from producing any milk. All dairy cattle

> must be sold for slaughter or export, to ensure that they produce no further domestic milk. *See* 7 C.F.R. § 1430.457(a) (1988). Moreover, the contractor must prevent his facility from being used by others to produce milk during the contract period, even if the premises are sold. *See* 7 C.F.R. § 1430.457(c), (d) (1988). Breach of any of these provisions subjects the contractor to penalties under the program.

884 F.2d 330, 333 (8th Cir. 1989). The key for the court was whether these government payments are earned through the sale of secured property, or by other means. *Id.* To the Eighth Circuit it was "evident that the Dairy Termination Program does not compensate producers for the loss of their cattle, but instead for their agreement to abandon the milk business for five years." *Id. See also Rainier Nat. Bank v Bachmann* 757 P.2d 979, 987-88 (Wash. 1988) (dissent) (distinguishing between PIK payments in which the farmer continues in the farming business but agrees to take crop land out of production for one growing season, and the DTP which eliminates the dairy farmer from production for a 5-year period.) Accordingly, the Court held that payments from the DTP program were considered a contractual general intangible as opposed to the "proceeds" of the dairy herd.

35. Unlike the federal DTP program, the CWT Program compensates producers for the slaughter of their cattle; it does not allow for cattle to simply be taken out of dairy production and "put out to pasture." They must be slaughtered. The CWT Program also does not require the producer to abandon the milk business. With respect to the Unconditional Payment, neither Johnson, the Johnson Dairy facility, nor Johnson's family is barred from the dairy business. The bid form does not contain a covenant not to compete, nor does it contain any provision requiring repayment of the 90% amount. To the contrary, it is completely permissible for Debtors (as they propose to do in the CWT Motion) to take the funds provided by the CWT Program for the slaughter of its dairy herd and use them to buy a new dairy herd. In contrast, under the federal DTP, if the dairy farmer re-entered the dairy business within the five-year proscribed period, he or she would be required to return all payments received. *Rainier*, 757 P.2d at 314. The Unconditional Payment is earned through the sale and slaughter of the dairy herd as opposed to any agreement by Debtors to abandon the dairy business. The Conditional Payment requires both the slaughter of the dairy herd and that Debtors cease operating a dairy farm for the short period of one year. Accordingly, under the reasoning by the Eighth Circuit, the CWT Payment must be considered "proceeds" of the dairy herd and subject to FDIC-R's security interest.

***Alternatively, CWT Payment Constitutes Rent, Contract Rights, or Other General Intangibles***

36. Through its security agreements and deeds of trust with Debtors, FDIC-R also has a perfected interest in all rents, issues, and profits of the dairy farm real estate, contract rights, or other general intangibles. *See ¶¶* 12 and 15 above.

37. As noted above, some courts have found DTP-type payments, particularly those conditioned on an agreement not to act (such as the Conditional Payment), to constitute rents, not proceeds. Under the Deeds of Trust that Mr. Johnson granted NFB, FDIC-R's collateral specifically extends to rents, issues, and profits and, therefore, covers the CWT Payments in the event any portion thereof is found to constitute rents payable to Mr. Johnson.

38.     *In re Clark* is an example of a Colorado case that found payments made under the Conservation Reserve Program (the "CRP") constitute rents, and not proceeds. In *In re Clark*, the CRP repeatedly referred to the payments as "rent." 82 B.R. 131, 133 (Bankr. D. Colo. 1987). Further, in *In re Clark*, the CRP payment was in lieu of planting crops and did not require that existing crops be destroyed. *Id.* Accordingly, even if *In re Clark* applies, FDIC-R's interest in rents attaches to any part of the CWT Payment considered to be rents.

39.     Alternatively, many courts have found that DTP-type payments constitute contract rights or general intangibles. *Lisbon Bank & Trust Co. v. Commodity Credit Corp.*, 679 F.Supp. 903 (N.D. Iowa, 1987) (security interest in contract rights or general intangibles grants interest in DTP payments); *Lovald v. Great Plains Production Credit Assoc. of Burke, South Dakota (In re Frasch)*, 53 B.R. 89 (Bankr. S.D., 1985) (holding that specific reference to general intangibles in security agreement is sufficient to grant interest in milk diversion program payments).

40.     Accordingly, even if any part of the CWT Payment is found not to constitute proceeds, FDIC-R maintains an interest in those payments due to its interest in Debtors' rents, issues, and profits, contract rights, and general intangibles.

**C.**   FDIC-R Has a Super-Priority Interest in the CWT Payment

41.     As of the Petition date Johnson Dairy owed in excess of $30 million on account of the Pre-Petition Debt, which is secured by substantially all of the assets of each of Johnson Dairy. Additionally, as of the Petition Date, Johnson Dairy has been using FDIC-R's Cash Collateral pursuant to several interim cash collateral orders. Each of these orders has provided FDIC-R with a super-priority administrative claim to the extent of the diminution of its collateral during the bankruptcy case.

**D.**   FDIC-R Must Receive Adequate Protection

42.     FDIC-R's interest must be adequately protected pursuant to § 363(e) before any disposition of the cows can be made.

43.     If the dairy herd is sold for slaughter, all or part of the CWT Payment must be used to provide FDIC-R with adequate protection because the livestock must be valued as a dairy herd and not solely at slaughter value. The Court must make a determination of the fair market value of the herd as a going concern and the value of FDIC-R's collateral cannot be determined on the basis of slaughter value. *In re Bowling*, 64 B.R. 710 (Bankr. W.D. Mo. 1986).

44.     As recently as July 26, 2009, an appraisal was completed to determine the market value of the cows. Taking the *many facts at* hand into consideration, including the current quarantine of the cows, the cows have a market value of $10,074,485—almost twice the Slaughter Payment.

45.     Pursuant to the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, the valuation of the cattle for the purpose of adequate protection should be based on either the replacement value or the foreclosure value of the cattle. 520 U.S. 953 (1997). While both these values are heavily dependent upon "the type of debtor and the nature of the property,"

neither valuation standard would result in the slaughter value in the case at hand. *Id.* at 965 n.6. The slaughter value is a substantially depressed value and has not been shown to be a proper valuation in this scenario.

46.   Importantly, any valuation of the cows should not result in a windfall to any party. *In re Coker*, 973 F.2d 258 (4th Cir. 1992). In the case at hand, Debtors would most certainly receive a windfall if they are allowed to assign the cows a slaughter value and receive any portion of the CWT Payment free and clear of the liens and encumbrances of FDIC-R and others. All parts of the CWT Payment arise out of the cows and, possibly, the land—in which Debtors have granted FDIC-R security interests. It would be a significant windfall to Debtors if they are now permitted to sell the cows at a slaughter value and keep for themselves the CWT Payment, which is intended to make up the difference in part between the slaughter value and the value Debtors otherwise could get for the cows if sold in the ordinary course of business.

**E.   It is a Breach of Debtors' Fiduciary Duty to Condition Participation in the CWT Program on the Categorization of the CWT Payment**

47.   To the extent Debtors are asserting that they will not participate in the CWT Program *unless* the Court determines that the CWT Payment is free and clear of all liens and security interests, that action would be a breach of the Debtors' fiduciary duties to the their bankruptcy estates. The CWT Program may be the best and highest value the Debtors can receive for their dairy herd. Accordingly, participation in the CWT Program is in the best interests of the Debtors' creditors. The Debtors' failure to take advantage of this opportunity would be grounds for immediate appointment of a chapter 11 trustee.[4]

## V.   CONCLUSION

24.   A determination that neither FDIC-R nor anyone else has a security interest in a potential payment from CWT simply is not possible on an expedited basis. A proceeding to determine the validity and priority of liens or interests in any CWT Payment must be brought before the Court as an adversary proceeding, rather than through an expedited motion which fails to afford sufficient notice and time for parties to be heard. Moreover, even if a determination may be made at this juncture, FDIC-R has a valid interest in any payments arising out of Debtors' participation in the CWT Program. All portions of the CWT Payment constitute rents, issues, or profits or proceeds of FDIC-R's collateral, contract rights or general intangibles, in which Debtors have granted FDIC-R security interests. FDIC-R's interest in the cows must be adequately protected under 11 U.S.C. § 363(e) at the full market value of the cows. This can only be achieved through escrow of the CWT Payments pending final determination of the extent and validity of all parties' rights.

48.   Accordingly, FDIC-R requests that Debtors be permitted to enter into the CWT Program only if the CWT Payments are placed in escrow pending determination of the extent and validity of FDIC-R's interests. In the alternative, should the Court determine that it is

---

[4] Nowhere in the CWT program, the bid form, or the Bylaws of CWT does it say that a trustee or secured creditor cannot partake in the program. Section 323 of the Code states the trustee's position as representative of the estate. In essence, the trustee steps into the shoes of the debtor. *In re Van Dresser Corp.*, 128 F.3d 945 (6th Cir. 1997) and *Sender v. Simon*, 84 F.3d 122 (10th Cir. 1996).

possible to decide the extent and priority of interests in the CWT Payments, FDIC-R holds a super-priority, secured, first lien on a portion of the CWT Payments and such interest must be adequately protected. Furthermore, any sale of the cows must be conditioned upon a payment to FDIC-R of $10,074,485, the market value of the cows, as opposed to the slaughter value of approximately $5.6 million.

Respectfully submitted this 6th day of August, 2009.

MARKUS WILLIAMS
YOUNG & ZIMMERMANN LLC

*s/ Steven R. Rider*
James T. Markus, #25065
Steven R. Rider, #7921
Jeffery O. McAnallen, #11389
1700 Lincoln Street, Suite 4000
Denver, Colorado 80203-4505
Telephone: (303) 830-0800
Facsimile: (303) 830-0809
Email: @MarkusWilliams.com

***Attorneys for Federal Deposit Insurance Corporation as Receiver for New Frontier Bank***

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August, 2009, I caused a true and correct copy of the foregoing **HEARING BRIEF ADDRESSING LEGAL ISSUES RELATED TO DEBTORS' COMBINED MOTION TO (1) AUTHORIZE DEBTORS TO ENTER INTO CWT PROGRAM OUT OF THE ORDINARY COURSE OF BUSINESS; AND (2) AUTHORIZE DEBTORS TO SELL AND SLAUGHTER COW HERD FREE AND CLEAR OF LIENS AND ENCUMBRANCES** to be placed into the United States mail, first class postage prepaid and correctly addressed as follows:

Peter J. Lucas
Appel & Lucas PC
1917 Market St., Suite A
Denver, CO  80202-1450

Joanne C. Speirs
U.S. Trustee's Office
999 18th Street, Suite 1551
 Denver, CO 80202

Patrick D. Vellone
Allen & Vellone PC
1600 Stout Street, Suite 1100
Denver, CO 80202

John A. O'Brien
Kerr Brosseau Bartlett O'Brien LLC
1600 Broadway, Suite 1600
Denver, CO  80202-4916

Harvey Sender
Sender & Wasserman PC
1660 Lincoln Street, Suite 2200
Denver, CO 80264

Lee M. Kutner
Kutner Miller Brinen PC
303 E. 17th Ave., Suite 500
Denver, CO 80203-1258

 /s/  Roberta Purser