UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                      )
                                            )
JOHNSON DAIRY, LLC                          )    Bankruptcy Case No. 09-10201-SBB
aka JF Cattle Co., LLC,                     )    Chapter 11
   Debtor.                            )
                                            )
EIN No.: 87-0703859                         )
_____)
IN RE:                                      )
                                            )
JOHN D. JOHNSON                             )    Bankruptcy Case No. 09-10203-SBB
                                            )    Chapter 11
   Debtor.                            )
                                            )    **Jointly administered under**
                                            )    **Case No. 09-10201-SBB**
                                            )

**NOTICE OF FILING OF SECOND AMENDED DISCLOSURE STATEMENT TO
ACCOMPANY CHAPTER 11 SECOND
AMENDED JOINT PLAN OF REOGANIZATION
DATED APRIL 22, 2010**

      Johnson Dairy, LLC and John D. Johnson (the "Debtors") by and through their attorneys, herewith files their Second Amended Disclosure Statement to Accompany Chapter 11 Second Amended Joint Plan of Reorganization dated April 22, 2010, a copy of which is attached hereto as Exhibit A.

Dated:  June 11, 2010                       Respectfully submitted,

                                            By:/s/Lee M. Kutner_____
                                                Lee M. Kutner #10966
                                                **KUTNER MILLER BRINEN, P.C.**
                                                303 E. 17th Avenue, Suite 500
                                                Denver, CO  80203
                                                Telephone:  (303) 832-2400
                                                Facsimile:  (303) 832-1510
                                                lmk@kutnerlaw.com
                                            Attorneys for John D. Johnson

By:/s/Jeffrey A. Weinman
    Jeffrey A. Weinman #7605
    Weinman & Associates, P.C.
    730 17th Street
    Suite 240
    Denver, CO 80202
    Telephone: (303) 572-1010
    Telecopier: (303) 572-1011
Attorneys for Johnson Dairy, LLC

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOHNSON DAIRY, LLC | ) | Bankruptcy Case No. 09-10201-SBB |
| aka JF Cattle Co., LLC, | ) | Chapter 11 |
|    Debtor. | ) | |
| | ) | |
| EIN No.: 87-0703859 | ) | |
| _____ | ) | |
| IN RE: | ) | |
| | ) | |
| JOHN D. JOHNSON | ) | Bankruptcy Case No. 09-10203-SBB |
| | ) | Chapter 11 |
|    Debtor. | ) | |
| | ) | **Jointly administered under** |
| | ) | **Case No. 09-10201-SBB** |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT TO ACCOMPANY CHAPTER 11
SECOND AMENDED JOINT PLAN OF REORGANIZATION
DATED APRIL 22, 2010**

## I.    INTRODUCTION

Johnson Dairy, LLC (the "Dairy") and John D. Johnson ("Johnson") prepared this Disclosure Statement to accompany their Chapter 11 Second Amended Joint Plan of Reorganization dated December 21, 2009 (the "Plan"), which was filed in the above-captioned Chapter 11 cases. This Disclosure Statement is being provided to all creditors and interest holders of the Dairy and Johnson (collectively, the "Debtors"). This Disclosure Statement is subject to final approval pursuant to 11 U.S.C. § 1125 by the United States Bankruptcy Court for the District of Colorado as containing adequate information to enable creditors and interest holders to determine whether to accept the Debtors' Plan. The Court's approval of this Disclosure Statement does not constitute a decision on the merits of the Plan. Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing which is scheduled for _____, 2010 at _____ ___.m. at the **United States Bankruptcy Court, Courtroom F, 721 19th Street, Denver, Colorado 80202.**

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.

This Disclosure Statement is provided to you along with a copy of the Debtors' Plan and a Ballot to be used for voting on the Plan. Please complete the Ballot according to the instructions contained on the Ballot if you intend to vote for or against the Debtors' Plan. Each creditor or interest holder may vote on the Plan by completing the enclosed Ballot and returning it to counsel for the Debtor, John D. Johnson, at the address set forth below:

Lee M. Kutner, Esq.
Kutner Miller Brinen, P.C.
303 East 17th Avenue
Suite 500
Denver, CO 80203

The Court set _____ as the last day to vote on the Plan (the "Balloting Deadline"). Accordingly, the Ballot must be received by Kutner Miller Brinen, P.C. no later than the Balloting Deadline. Capitalized terms contained in this Disclosure Statement that are defined in the Plan have the same meaning as set forth in the definitional section of the Plan (Article II).

**Recommendation**. As discussed more fully below, the Debtors firmly believe that the Plan represents the best alternative for providing the maximum value for creditors. The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtors. **Again, the Debtors strongly believe that confirmation of the Plan is in the best interest of creditors and recommend that all creditors entitled to vote on the Plan vote to accept the Plan.**

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.

2

**Voting Classes**.  Each holder of an Allowed Claim in Classes 2, 3, 4, B, C, and D shall be entitled to vote to accept or reject the Plan.

**Deemed Acceptance of Plan**.  Unimpaired classes are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Classes 1, 5, and A are unimpaired by the Plan.

**Deemed Rejection of Plan**.  Classes that receive and retain nothing under the Plan are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Class E, the interests in the Dairy, is deemed to have rejected the Plan.

**One Vote Per Holder.**  If a holder of a Claim holds more than one Claim in any one Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

## II.   CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals.  Chapter 11 allows the Debtors to retain their assets during the administration of their Chapter 11 cases as debtors-in-possession.  Following confirmation of the Plan, Chapter 11 allows the Debtors to retain their assets as reorganized debtors or as otherwise provided in the Plan.  If the Plan is approved by the Court, the Plan is the permanent restructuring of the Debtors' financial obligations.  The Plan also provides a means through which the Debtors will restructure or repay their obligations.  The Plan will provide the Debtors with an opportunity to maximize the return for creditors through continued operations.

The Plan divides creditors into classes of similarly situated creditors.  All creditors of the same Class are treated in a similar fashion.  All member Interests are also classified and treated alike.  Each Class of creditors or interest holders is either impaired or unimpaired under the Plan.  A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled or if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to default.

The Bankruptcy Court set May 21, 2009, as the last date for filing Proofs of Claim (the "Bar Date").  The Plan provides that Claims and Interests of all Classes shall be allowed only if such

Claims are either: a) evidenced by a timely filed Proof of Claim or Interest; or b) appear in the Schedules filed by the Debtors and are not scheduled as disputed, contingent or unliquidated, unless subsequently allowed by the Court. Creditors may check as to whether or not their Claims are scheduled as disputed, contingent or unliquidated by reviewing the Schedules and the amendments thereto filed by the Debtors in the Bankruptcy Court for the District of Colorado. Alternatively, creditors may contact counsel for the Debtors or the Debtors directly in order to determine how their claim was scheduled.

Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan. The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two thirds in amount, without including insider acceptance of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under and has not accepted the Plan. Since the Debtors believe that the Plan provides the best alternative for creditors, all creditors are urged to vote to accept the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtors.

### III.    OVERVIEW OF THE PLAN/MEANS OF EXECUTION

The Plan divides creditors and interest holders into the following 10 Classes. Treatment of each of the Classes is discussed in greater detail below and in the Plan. The following tables summarize the 10 Classes, whether or not each such Class is impaired, and, to the extent determinable, the treatment of each Class:

4

**Johnson**

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| 1: Priority Claims | Unimpaired | 100% distribution |
| 2: Weld County Treasurer | Impaired | Paid in full over no more than 3 years with interest at the statutory rate. |

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| 3 AgStar Financial Services, FLCA ("AgStar") | Impaired | AgStar will retain its lien on the Dairy Property, and the principal amount of the claim will be equal to the amount due on the Petition Date. The Claim will bear interest at 5% per annum and will be paid in monthly installments based on a 30 year amortization, unless otherwise agreed. $1,000,000 would be added to the real estate loan. McFinney Agri-Finance would make a new $2,000,000 loan. Both loans would be cross-collateralized, both will balloon in 3 years. There will be additional terms and conditions of any such loans satisfactory to Agstar and McFinney Agri-Finance in their sole discretion. If the Debtor is not satisfied with the terms, the Debtor will not borrow the money and any Court approval of the Disclosure Statement will be moot. |
| 4: Unsecured Claims | Impaired | Paid in full as an assumed lease or secured Class B creditor under Dairy Plan. See below for treatment of claims. |
| 5: Interest | Unimpaired | Class 5 will retain its interest in all remaining property Class 5 owned prior to the Confirmation Date. |

**The Dairy**

| CLASS | IMPAIRMENT | ESTIMATED DISTRIBUTION |
|---|---|---|
| A. Priority Claims | Unimpaired | 100% distribution |

5

| B. AGCO Finance | Impaired | AGCO will retain its lien and the claim will be allowed in full. The Claim will bear interest at 5% per annum and will be paid in monthly installments based on a 10 year amortization, unless otherwise determined. |
| C: John Deere Credit, Inc. | Impaired | Class C will be paid in accordance with their Court approved stipulation. |

| D: Unsecured Claims | Impaired | Class D claimants will be paid a pro rata share of $3 million plus any recoveries from Avoidance Actions. |
| E: Interest | Impaired | Class E will be cancelled. |

Pursuant to the Plan, the Debtors shall restructure their debts and obligations and the Dairy will continue to operate in the ordinary course of business. Funding for the Plan shall be from income derived from the Dairy's ongoing operations and a new loan of $3 million which the Debtors expect to receive from AgStar, the AgStar Loan. The Dairy is in the process of implementing a revised business plan for a smaller sized Dairy. Under the revised business plan, the Dairy will operate its small milk barn, which will increase the Dairy's efficiency, decrease its labor and operating needs, and eliminate the need for additional funding and debt service. Additionally, as set forth in more detail below, during the course of this case Johnson and the Dairy have entered into a settlement agreement with the Debtors' largest pre-petition lender, the Federal Deposit Insurance Company, as Receiver for New Frontier Bank ("FDIC-R") and two cow lessors. This settlement agreement allowed the Debtors to eliminate over $50 million in debt owed to FDIC-R and the lessors, and restart the newer, streamlined dairy operations with substantially less secured debt.

## BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

### A.    Background

Johnson has been in the dairy industry for over 25 years: He grew up on a dairy in Nebraska, managed a large dairy in Northern Colorado in the 1980s and 1990s, established JF Cattle Company ("JF Cattle") over 13 years ago as a heifer-raising facility in what was then a run down feed lot in

6

Eaton, Colorado; and is now the owner and operator of the Dairy. Johnson has weathered tough economic times in the industry before, and has emerged with revitalized business plans. When milk prices dropped significantly in 2003 and Johnson only owned JF Cattle, Johnson made the business decision to expand his operations to include a dairy facility instead of selling the heifers for low prices. This approach led Johnson to build the Dairy's first dairy parlor in 2003 and the Dairy began operations that same year.

Johnson Dairy LLC is a sole member LLC owned wholly by Johnson. At its inception, the Dairy was a smaller dairy that consisted of one milk barn that could milk approximately 3,000 cows. Johnson expanded the Dairy from 2003 to 2007 by adding a sick pen barn and a new milk barn, the result of which made the Dairy one of the largest dairies in the State of Colorado, with more than 10,000 cows producing 8 to 10% of all milk sold in the state at its peak. Today, Dairy's operations include a scaled down dairy operation and the heifer growing operation.

**B.      Events Leading to Chapter 11 Case.**

The Dairy operation and its expansion were funded primarily through loans the Debtors entered into with New Frontier Bank ("NFB"), all of which were arranged by Gregory Bell, NFB's chief lending officer. NFB provided Johnson with an initial construction loan in 2003, which was used to build the initial milk barn, a second construction loan in 2005 to build the sick barn, and another construction loan in 2006 to build a larger milk barn.

After providing Johnson with the initial construction loan and the loan for the sick barn, the Debtors needed additional funds to fill the milk barn and bring it to capacity. The Debtors were at the end of their legal lending limit with NFB and needed additional funds. Accordingly from 2003 - 2005, NFB orchestrated a series of so called cow "lease" arrangements with Daniel and Susan Kruse (the "Kruses") wherein the Kruses borrowed money from NFB to purchase the cows from Johnson, the Kruses leased the cows back to Johnson for a monthly lease payment, and Johnson used the cow sale proceeds to pay off a portion of the debt the Debtors owed to NFB.

While Johnson was in the middle of constructing the larger milk barn, Johnson was in dire need of additional capital, because NFB failed to meet the additional lending commitments that had been promised to the Dairy operation. Consequently, Johnson had to sell hundreds of head of open heifers to pay operating bills in late 2007, which resulted in Johnson losing future milk-cows.

7

Around that time, again, at the direction of NFB, Johnson entered into another cow lease arrangement with Timothy Thissen, wherein Thissen purchased a portion of Johnson's cows, Thissen leased the cows back to Johnson for a monthly payment, and Johnson paid off a portion of his existing NFB loans with the Thissen proceeds.

In 2008, the Debtors' financial stability was quickly eroding. NFB, again, was failing to meet its loan commitments to Johnson, and Johnson was, again forced to sell some of his herd, this time 5000 head of heifers, to pay bills, including his payments on the existing loans with NFB. Additionally, Johnson was forced to exercise his right under the lease with Thissen to repurchase his heifers for a $300 per head penalty. To make matters worse, NFB promised Johnson that it would loan Johnson an additional $2-3 million if Johnson would agree to a $12,000,000 take-out of his NFB debt to AgStar Financial Services. Not only did Johnson never receive the funds after he agreed to the deal, but the terms of the take-out increased Johnson's monthly payment on the loan by several thousand dollars. Still in need of additional capital, Johnson entered into a $5,000,000 loan with NFB on the condition that Johnson use $1,000,000 of the money to purchase stock in NFB.

The problems relating with NFB, the loan take-out with AgStar, and the steep payments under the leases, combined with a significant drop in the price of milk in 2008 and a sharp increase in the price of feed put the Debtors in a position where they were unable to make loan payments and pay the Dairy's vendors. Accordingly, in order to protect the Debtors, their creditors, and to reorganize their debt, the Dairy and Johnson filed for protection under Chapter 11 of the Bankruptcy Code on January 8, 2009 (the "Petition Date").

## V.    DESCRIPTION OF ASSETS

It is important for creditors to understand that the Johnson and Johnson Dairy cases are being jointly administered at the Bankruptcy Court but they are not substantively consolidated. The cases present two separate estates with their own distinct creditors and assets. The creditors of one estate can not look to the other estate for assets to repay their claims. Such action would require extensive litigation that would likely be complex, opposed by one or both Debtors, opposed by certain creditors, uncertain of result, time consuming, and expensive. The following is a brief description of the Debtors' assets.

8

A.    **Property**

The following is the list of property in the Debtors' possession as of January 1, 2010. The values provided for the real estate are based on John Johnson's best estimate and opinion of the values in today's market. In the case of the Real Property, underlying the dairy, the value is based in addition on the value provided to Mr. Johnson from the FDIC and reflects what he understood their valuation to be. In the event the real property is not used for a dairy property, the value could decline substantially. It must also be kept in mind that the agricultural real estate market in Weld County at this time is very uncertain and both buyers and financing are difficult to locate.

**Johnson**

| Asset | Estimated Value |
|---|---|
| Real Property-- underlying portion of dairy | $12,000,000.00 |
| Real Property – Fabricious Farm | $500,000.00 |
| Real Property – Hall Property | $400,000.00 |
| Real Property – Residence and Feedlot | $800,000.00 |
| Cash | $15,000.00 |
| Household Goods and Furnishings | $1,535.00 |
| Clothing | $500.00 |
| Term Life Insurance Policy | $0.00 |
| | |
| New Frontier Bank Stock | $0.00 |
| Rings and Watch | $1,000.00 |
| Vehicles | $13,000.00 |
| Interest in Johnson Dairy | $0.00 |
| | |
| **Total** | $13,731,035.00 |

**The Dairy**

| Asset | Estimated Value |
|---|---|
| Accounts Receivable | $150,000.00 |
| Feed | $100,000.00 |
| Machinery, equipment, office equipment1 | $2,290,725.00 |
| Automobiles | Included above |
| Livestock per Exhibit D-1 | 3,654,084.00 |
| **Total** | $6,194,809.00 |

**The asset values set forth above represent a gross value for each asset, not a value net of liens.** While the Debtors report the assets as holding these values, the most significant property is owned by Johnson and underlies a portion of the dairy. This property is encumbered by a first lien held by AgStar for its claim of $12,588,119.00. AgStar's lien also encumbers the equipment located at and owned by the Dairy. Certain other dairy equipment is pledged as collateral to the Dairy's secured creditor AGCO and leased from the lessor, Caterpillar. Cash varies monthly but is generally enough to pay monthly operating expenses. The feed inventory is sufficient to sustain livestock feeding for a relatively short period of time. The equipment values provided are based on the appraisal done for the Debtor by Dickensheet & Assoc. during the course of the Chapter 11 case. Feed and other personal property assets are valued based on the Debtors' own opinion and knowledge of the marketplace.

**B.     Avoidance Actions**

The Debtors are reserving the right to bring Avoidance Actions pursuant to 11 U.S.C. §§ 545 through 550 and state law based fraudulent conveyance actions. The Debtors are currently in the process of evaluating these claims to determine which, if any, claims are viable. Johnson did not pay any unsecured creditors more than $5,470.00 within the 90 days prior to the Petition Date. The Dairy paid several non-insider creditors within the 90 days prior to the Petition Date and insiders received $251,372.00 in owner draws within the year prior to the Dairy's Chapter 11 filing, which represented reasonable compensation for the services performed.

---

1 The equipment includes $1,901,300, appraised value, of equipment leased from Caterpillar or secured by AGCO claims that exceed the value of such equipment.

The Debtors' preliminary analysis indicates that many of these payments were likely made in the ordinary course of business and therefore are subject to defense pursuant to 11 U.S.C. § 547(c)(2), as the Dairy traditionally paid its vendors when due in accordance with invoice terms. The Dairy is currently investigating the avoidance actions in greater detail including claims against Northern Feed & Bean. In addition, some creditors provided new value after the transfers, making the claims subject to defense pursuant to 11 U.S.C. § 547(c)(4). Some of the transfers between the Debtors and the creditors were contemporaneous and therefore are subject to defense pursuant to 11 U.S.C. § 547(c)(1). From a practical standpoint, the viability of the Plan and, in turn, the distribution to creditors is dependent upon the Debtors' on-going business operations. The bringing of avoidance actions may strain the relationship the Debtors have with their ongoing suppliers and only harm rather then help the Debtors' reorganization prospects and ultimately the distribution to creditors. If the actions were brought, the Debtors would also incur costs and expenses in the form of legal fees that may not be justified by the possible recovery. The Debtors expect that the recovery to creditors as proposed under the Plan will exceed any reasonable recovery that could be obtained solely from pursuit of the Avoidance Actions  Pursuant to the Plan, if the Debtors either do not choose to pursue an Avoidance Action or agree to settle such a claim and the Creditors Committee disagrees with such decision and elects to pursue the claim, the Creditors Committee may pursue the Avoidance Action itself at its own cost and expense.

**Tax Issues**

The Creditors Committee has indicated that the Debtors may have net operating losses that could be of value to the Debtors now or in the future. Any losses which the Debtors may have suffered in the past that resulted in net operating loss carry forwards, will be completely utilized during the year 2009. The Debtors will have used all losses to offset gains resulting from the sale of cattle in the CWT program and released indebtedness resulting from the settlement with FDIC-R.

**Dairy Issues**

The brand used with respect to the Dairy livestock is owned by John Johnson. The brand is leased to the Dairy pursuant to a five (5) year lease, the maximum term permitted in Colorado. The current lease term ends on December 31, 2011. The lease term will be renewed at the end of the current five year term and the renewal will likely be a requirement of the proposed AgStar loan.

The Dairy is a party to the Dairy Farmers of America (DFA) Membership and Marketing Agreement.  Mr. Johnson is the authorized representative of the Dairy.  Similarly, the DFA capital account and the DFA production history are also in the name of the Dairy.

## V.       DESCRIPTION OF LIABILITIES

### A.       Priority Claims

#### 1.       Priority Claims

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority payment under 11 U.S.C. § 507(a) of the Bankruptcy Code, excluding any Administrative Claim or Tax Claim.

#### 2.       Administrative Claims

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in either section 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered after the commencement of these Chapter 11 Cases; (b) Professional Fee Claims; (c) all fees and charges assessed against the estate under 28 U.S.C. §1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under section 546(c)(2)(A) of the Bankruptcy Code.

##### a.       Professional Fees

The Debtors hired several professionals during these Chapter 11 cases, and the creditors committee has hired counsel to represent it in the Dairy case.   The Administrative Claims for the professional fees incurred during the case and expected to be unpaid and outstanding at the time of Plan confirmation, assuming minimal litigation over the disclosure statement and Plan, are set forth below.

12

| Administrative Claimant | Professional Services Provided | Estimated Claim |
|---|---|---|
| Weinman & Associates PC ("Weinman") | Bankruptcy Counsel for Dairy | $50,000 |
| Kutner Miller Brinen PC ("KMB") | Bankruptcy Counsel for Johnson | $50,000 |
| Otten Johnson Robinson Neff & Ragonetti | Special Counsel for Debtor (cash collateral issues) | $30,000 |
| Allen & Vellone P.C. | Special Counsel for the Debtors (claims relating to NFB and the FDIC) | $30,000 |
| Joseph Law Firm | Special Counsel for Dairy (immigration issues) | $0 |
| Genske Mulder & Co, LLP | Accountant for Debtors | $3,000 |
| Fairfield &Woods P.C. (Caroline Fuller) | Counsel for Unsecured Creditors' Committee | $25,000 |
| C Raymond Hunter | Examiner | $0 |
| Burns Figa & Will | Special Counsel- Environmental Issues | $3,000 |

### b.    North Weld Water District

North Weld County Water District ("North Weld") filed a proof of claim in the Johnson case asserting a total claim amount of $312,402.95 for water utilities.  The parties have agreed to settle this claim for $117,759.85.  The Debtors filed a motion to approve the settlement agreement, and objections were due by January 11, 2010.  The Settlement Agreement has been approved by the Court and the settlement amount has been paid.

### c.    Other Administrative Expenses

The Court originally set January 1, 2010 as the administrative claim bar date for §503(b)(9) claims, however this date has since been extended to February 16, 2010.  As of February 16, 2010, three (3) additional creditors have filed applications for the allowance of administrative claims, based on their reclamation rights under §503(b)(9):  Teague Enterprises ("Teague"), Northern Feed & Bean Co ("Northern") and Commodity Specialists Company ("CSC").  The Debtor has contested all of the applications.  A hearing on Teague's application was scheduled for February 3, 2010 and a hearing on CSC's application was scheduled for March 3, 2010.  The Teague claim was settled for $20,069 and the CSC claim was settled for $40,725.36.  The Dairy objection to the Northern Feed application is being addressed in the context of an adversary proceeding brought by the Dairy against

13

Northern. The adversary proceeding seeks to recover preferential transfers made to Northern and to subordinate or offset Northern's administrative claim.

Debtors have paid their administrative expenses in the ordinary course of business during the course of the bankruptcy case, and therefore do not believe there will be any other material administrative Claims asserted against the estates. However, at any given time there are accounts payable which are generally subject to offset by current accounts receivable.

The Debtor, John Johnson, may owe an administrative tax claim for income tax for the year 2009. The tax would be due as a result of application of the alternative minimum tax resulting from gains incurred in the sale of the cow herd. The Debtor's tax advisors are working on this tax issue and will attempt to resolve the claim with the I.R.S. The claim could be as high as $100,000.

### 3.     Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. §507(a)(8). There were no Tax Claims asserted against Johnson, as listed on his schedules or as indicated on proofs of claim filed in his case. The Tax Claims asserted against the Dairy as listed on its Schedules or as indicated on proofs of claim filed in the case are:

|                         | Schedules | Proof of Claim |
|-------------------------|-----------|----------------|
| Internal Revenue Service | N/A       | $100[2]        |

### 4.     Employee Claims

Pursuant to 11 U.S.C. § 507(a)(4), wages, salaries and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $10,950.00 per employee earned within the 180 days prior to the Petition Date are entitled to priority. Pursuant to the Debtors' books and records, there are no claims entitled to priority pursuant to § 507(a)(3). The Debtors do not believe that there are any Employee Claims.

### 5.     Immigrations and Customs Enforcement

During the course of the Chapter 11 case, the Dairy was subject to an investigation by the United States Department of Homeland Security and the United States Immigrations and Customs Enforcement ("ICE"). The investigation involved workers at the Dairy and whether they held proper credentials in order to be employed in the United States. The result was a settlement under which the

_____

2 The Internal Revenue Service's proof of claim is for a total amount of $1,449.49. However, the IRS only asserts

14

Debtor is required to pay the sum of $100,800. This settlement has been filed with the Court and has been approved. The settlement provides for payment of this claim over two years with a monthly payment of $4,200.

## B.    Secured Claims

1.    **Weld County Treasurer**. The Weld County Treasurer holds a secured claim against Johnson's real property related to real estate taxes from 2008. The Weld County Treasurer did not file a proof of claim. Debtor scheduled this claim in the amount of $40,000.

2.    **FDIC as Receiver for New Frontier Bank and/or its assignee AgStar Financial Services FLCA.** AgStar Financial Services FLCA ("AgStar") holds a secured claim against the Dairy Property owned by Johnson and certain equipment owned by the Dairy. The AgStar claim consists of principal in the amount of $12,417,500.80 plus interest to the petition date in the amount of $178,658.92 for a total of $12,596,159.72. The claim arises out of a Promissory Note dated January 24, 2008 in the original principal amount of $12,628,645, a Debt Modification Agreement dated January 24, 2008, a deed of trust that was properly recorded February 12, 2008 in the Weld County Recorder office, as document number 3534839, and a Security Agreement granted by the Dairy in October 2008. While the Security Agreement was granted within the 90 days prior to the Chapter 11 filing it appears that it was supported by equivalent value provided to the form of interest rate reductions. AgStar now owns approximately 100% of this loan and the balance which was owned by FDIC-R is now owned by AgStar.

3.    **AGCO Finance.** AGCO finance holds a secured claim against the Dairy arising from certain retail installment and security contracts. AGCO filed four proofs of claim asserting a total amount owed of $1,116,846.04. The Debtor intends to use the equipment in the ordinary course of business and therefore intends to pay the full balance of the claim over time with interest as a fully secured claim. In a liquidation, the value of the equipment would be less than the amount due. Based on an appraisal obtained by the Debtor, the value of the equipment in a liquidation would be $809,000. The unsecured portion of the claim, or deficiency would be $307,846.

---

that $100 is entitled to priority.

4.     **John Deere Credit**.  This creditor holds a security interest in a small tractor owned by the Dairy.  The monthly payment will be made by the Dairy pursuant to a stipulation previously approved by the Court.

**C.     Leases and Executory Contracts**

The Debtors were party to several pre-Petition Date leases or executory contracts.  Under the terms of the Plan, the Debtors are assuming all executory contracts and unexpired leases: (a) that were previously assumed by the Debtor pursuant to Court Order, (b) for which a motion to assume has been filed and is pending, and (c) are specifically listed on Exhibit A of the Plan.  The Debtors maintain the right to modify Exhibit A of the Plan through the Plan Confirmation Date. Confirmation of the Plan shall constitute a determination that the payments to be made to creditors of assumed leases or executory contracts pursuant to the Plan satisfies all conditions precedent set forth in 11 U.S.C. § 365.

The Debtors are rejecting all executory contracts and unexpired leases previously rejected by Court Order, subject to a pending motion to reject, or not specifically assumed in accordance with the Plan.  All proofs of Claim with respect to Claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of (i) the date of the Court order approving the Debtors' rejection of such executory contract or unexpired lease or (ii) the Confirmation Date.

1. Caterpillar Financial Services, is the lessor under thirteen equipment leases with the Dairy. The Dairy intends to modify the leases and pay them in full as modified.  A separate motion will be filed in the Court for approval of the lease modification on notice to creditors.

2. Agland is party to a prepetition feed supply contract with the Dairy.  This contract has been rejected by separate motion on notice to creditors.  The Dairy has recently negotiated a settlement with Agland.  The settlement provides in part that the Dairy deferred patronage account with Agland will be set off against a pre-petition promissory note claim of $279,111.58 which will reduce this claim by approximately $104,332.65.  Agland will also hold an additional unsecured claim for rejection damages in the amount of $946,251.48.

### D.     Non-Priority Unsecured Claims

The Debtors have a number of unsecured pre-Petition Date creditors.   Several of the unsecured creditors filed proofs of Claim on or before the Bar Date. Attached hereto as Exhibits A and B are lists of general unsecured Class 4 (Johnson) & D (Dairy) Claims.   These lists include the amounts listed on the Debtors schedules, and the amounts asserted by the Creditors in their Proof of Claims.   To the extent the amount filed by the creditor is different than the amount listed on the Debtor's schedules, the amount of the Claim as filed by the creditor is considered in the analysis.

The total amount of Class 4 Claims asserted against the Johnson estate is $1,802,389.06. This amount consists entirely of the unsecured guarantees executed by Johnson with respect to the Caterpillar and AGCO lease and secured claims.   The Plan provides that the lease and secured claim will both be paid in full by the Dairy and therefore under the Plan, the Dairy will be paying these claims.   The Class D, unsecured claims of the Dairy totals $ 6,774,521.   This amount includes the rejection damages claim of Agland of approximately $1 million and deficiency claims from Caterpillar and AGCO of $773,592.   However, if the Plan is confirmed, the Caterpillar and AGCO deficiency claims will be paid as part of the lease and secured claim of these two creditors and the total Class D claims will be $6,000,929.   Classes 4 and D are being treated as detailed in the Plan Description section of this Disclosure Statement and as set forth in the Plan.

## VII.     DESCRIPTION OF THE PLAN

### A.     General Description

The Debtors filed their Joint Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado on December 21, 2009, the Plan has been amended and may be additionally amended prior to confirmation.   The Plan provides for the reorganization of the Debtors under Chapter 11 of the Bankruptcy Code.   Pursuant to the Plan, the Debtors shall restructure their debts and obligations and the Dairy shall continue to operate its existing dairy in the ordinary course of business.

The Plan provides for the specification and treatment of all creditors and Interest holders of the Debtors.   The Plan identifies whether each Class is impaired or unimpaired.   A Class is

17

unimpaired only if the Plan leaves unaltered the legal, equitable or contractual obligations between the Debtors and the unimpaired claimants or interest holders. The following is a brief summary of the Plan. The actual text of the Plan should be reviewed for more specific detail.

As provided in Section 1123(a)(1) of the Bankruptcy Code, the Priority, Administrative and Tax Claims against the Debtors are not designated as classes. The holders of such Allowed Claims will be paid in full and are not entitled to vote on the Plan.

The Plan divides the creditors into separate classes. The classes are set forth as follows:

**Johnson**

| | |
|---|---|
| <u>Class 1</u> | All Allowed Unsecured Claims specified in Section 507(a)(3), 507(a)(4) or 507(a)(5) of the Code as having priority. |
| <u>Class 2</u> | The Allowed Secured Claim held by the Weld County Treasurer. |
| <u>Class 3</u> | The Allowed Secured Claim held by FDIC as receiver for New Frontier Bank and/or its assignee AgStar Financial Services FLCA. |
| <u>Class 4</u> | The Allowed Claims held by unsecured creditors. |
| <u>Class 5</u> | The Interests held by Johnson. |

**The Dairy**

| | |
|---|---|
| <u>Class A</u> | All Allowed Unsecured Claims specified in Section 507(a)(3), 507(a)(4) or 507(a)(5) of the Code as having priority. |
| <u>Class B</u> | The Allowed Secured Claim held by AGCO Finance. |
| <u>Class D</u> | The Allowed Claims held by unsecured creditors. |
| <u>Class E</u> | The Interests held by Johnson |
| Class C | The Allowed Secured Claim of John Deere Credit |

**B.    CLAIMS**

    **1.    Unclassified Priority Claims**

        **a.    Administrative Claims**

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Bankruptcy Code, including the costs and expenses of administration, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by the particular holders of such Claims. Such Claims shall be paid in full on the Plan Effective Date, or treated as otherwise agreed by the particular holders of such Claims. Administrative Claims that are allowed by the Court after the Effective Date of the Plan shall be paid upon allowance or as

18

otherwise agree. The Debtors expect the following claimants will hold a cost and administrative claim for professional services as of the Confirmation Date of the Plan:

| Administrative Claimant | Est. Remaining Claim | Amount Paid to Date |
|---|---|---|
| Weinman & Associates, P.C. | $50,000 | $104,000 |
| Kutner Miller Brinen PC ("KMB") | $50,000 | $61,075 |
| Otten Johnson Robinson Neff & Ragonetti | $30,000 | $82,000 |
| Allen & Vellone P.C. | $30,000 | $211,349 |
| Joseph Law Firm | 0 | $16,180 |
| Genske Mulder & Co, LLP | $3,000 | $8,837 |
| Fairfield &Woods P.C. | $25,000 | $55,145 |
| Examiner | 0 | $20,278 |
| North Weld Water District | 0 | $117,759.85      paid      per settlement |
| Burns Figa & Will | $3,000 | |

The Administrative Claims of professionals, set forth above, are all claims of the Dairy estate with the exception of the claim of KMB which is only an Administrative Claim in the individual case of John Johnson.

All Administrative Claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing. Certain professional fees may be paid pursuant to interim fee applications and upon Court allowance. The professional fees set forth above are the total fees expected to remain in the case as of the estimated Confirmation Date of the Plan, assuming minimal litigation over the Plan, and the payments that have been made during the case through retainers or otherwise.

**b.    Tax Claims**

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8). Tax Claims, previously described, will be paid on the Effective Date of the Plan or in monthly payments on an amortized basis over a period that does not exceed thee (3) years from the Petition Date with an interest at the statutory rate.

19

### c. Reclamation and other Priority Claims

The Dairy expects the following reclamation and other priority claims:

| | | |
|---|---|---|
| 1. | Commodity Specialists | $40,725 |
| 2. | Teague Enterprises | $20,069 |
| 3. | Northern Feed and Bean | $66,279 |
| 4. | ICE | $100,800 |

Real property taxes due for the post-petition year 2009 are being paid on a current basis.

### 2. Classified Priority Claims

### a. Classes 1 and A

The Allowed Class 1 and Class A Priority Claims shall be paid in full on the Effective Date. The Class 1 and Class A Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4), 507(a)(5), and 507(a)(6) of the Code. The Debtors do not expect that any claims will exist in these classes.

### 3. Secured Claims

**a. Johnson, Class 2, Weld County Treasurer.** The Class 2 Secured Claim is impaired by this Plan. The Class 2 Secured Claim will be Allowed in its full amount and paid with interest at the statutory rate over a period not to exceed three (3) years. The statutory rights of the Class 2 claimant are otherwise unaffected by the Plan.

**b. Johnson, Class 3, AgStar.** The Class 3 Secured Claim is impaired by the Plan. The Class 3 Secured Claim will be treated and paid as follows:

1) The principal amount of the Class 3 Claim will be allowed in an amount equal to the amount due the Class 3 claimant on the Petition Date, an amount agreed to by the parties or fixed by the Court at the confirmation hearing. Johnson expects the claim to consist of $12,417,580 in principal and $178,659 in interest as of the petition date. Additional fees and costs may be added to this claim.

2) The Class 3 Claim will bear interest at the rate of: (a) 5% per annum commencing on the Effective Date of the Plan; or (b) such rate will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. § 1129(b) of the Code; or (c) such other rate as agreed by the Johnson and the Class 3 claimant.

20

3)      The Class 3 claimant will retain all liens that secured its Claim as of the Petition Date.

4)      The monthly payment of the Class 3 Claim shall be calculated based upon a thirty (30) year amortization of the Claim and paid in monthly installments or as otherwise agreed upon by the parties.  The estimated monthly payment is expected to be at least $67,619.

5)      The Debtors expect that they will borrow from AgStar under a separate loan arrangement the sum of $1 million and from McFinney Agri-Finance the sum of $2 million in new loans following confirmation to be invested in the Dairy for equity and then used to pay unsecured creditors.  Both new loans would be cross-collateralized, and both would balloon in three years.  There will be additional terms and conditions of any such loans satisfactory to Agstar and McFinney Agri-Finance in their sole discretion.  If the Debtors are not satisfied with the terms, the Debtors will not borrow the money and any Court approval of this Disclosure Statement will be moot.

**d.      Dairy, Class B, AGCO Finance.**   The Class B Secured Claim shall be impaired by this Plan.  The Class B secured creditor will be treated as follows:

1)      The principal amount of the Class B Claim will be allowed in an amount equal to the amount of the claim as of the Petition Date, unless the Class B claimant objects to such amount in writing and serves a copy of such objection on the Debtors at least fifteen (15) days prior to the commencement of the confirmation hearing, in which case the principal balance of the claim will either be agreed to by the parties or fixed by the Court at the confirmation hearing.  The claim is assumed to be $1,201,155 based on the claim filed.

2)      The Class B Claim will bear interest at the rate of: (a) 5% per annum commencing on the Effective Date of the Plan; or (b) if the Class B claimant objects to such rate in writing and serves a copy of such objection on the Debtors at least fifteen (15) days prior to the commencement of the confirmation hearing, such rate will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. § 1129(b) of the Code; or (c) such other rate as agreed by the Johnson and the Class B claimant.

3)      The Class B claimant will retain all liens that secured its Claim as of the Petition Date.

21

4)       The monthly payment of the Class B Claim shall be calculated based upon a five (5) year amortization of the Claim and paid in monthly installments. The estimated monthly payment is expected to be $22,667.

e.       **Dairy Class C, John Deere Credit.** This is a relatively small claim secured by a tractor. The Dairy will enter into a restructuring agreement with John Deere and seek Court approval of the agreement. The claim will be paid according to the restructured agreement.

4.       **General Unsecured Claims**

a.       **Class 4, General Unsecured Claims Against Johnson.** The Class 4 claimants shall receive payment of their Allowed Claims in full pursuant to the treatment of such claim by the Dairy. In the case of the Caterpillar claim, the lease will be assumed by the Dairy and paid according to its terms. In the case of AGCO, the secured claim will be paid in full by the Dairy. Class 4 claimants shall be considered paid in full from Johnson on the Effective Date of the Plan and all future consideration payable to such class shall be paid by the Dairy.

b.       **Class D, General Unsecured Claims Against the Dairy.** Class D consists of those unsecured creditors of Dairy who hold Allowed Claims. Class D claimants shall receive a pro-rata distribution of the sum of $3 million within fifteen days of the Effective Date of the Plan.

In addition, the Class D claimants will be entitled to receive the proceeds of any Avoidance Action pursued by either the Debtors or the Creditors Committee. The Plan contains a provision under which the Debtors have the right to pursue through litigation or settlement any of the Avoidance Actions. In the event the Debtors elect not to purse or to settle an Avoidance Action, they shall first consult with the Creditors Committee as to whether they agree with the decision. If the Creditors Committee does not agree with the decision not to purse a claim or to settle, the Creditors Committee may elect to pursue the Avoidance Action, at their own cost and expense, or settle it on terms they deem appropriate. All fees and costs of the Creditors Committee may be paid out of Avoidance Action recoveries prior to the distribution of the proceeds to Class D.

5.       **Interests**

a.       **Class 5, Interests in Johnson held by Johnson.** Class 5 is unimpaired by this Plan. On the Effective Date of the Plan Class 5 shall retain its interests in all remaining properties and assets which it owned prior to the Confirmation Date.

22

b. **Class E, Interests in the Dairy held by Johnson.** Class E is impaired by this Plan. On the Effective Date of the Plan all Class E interests shall be cancelled and of no further force or effect. New interests in the Dairy shall be issued to Johnson in exchange for the $3 million in funds required to pay Class D.

**B.    Means for Execution of the Plan**

Pursuant to the Plan, the Debtors shall restructure their debts and obligations and the Dairy will continue to operate in the ordinary course of business. Funding for the Plan shall be from income derived from the Dairy's ongoing operations and from a new $3 million loan expected to be obtained from AgStar. As set forth in more detail below, Johnson and the Dairy have entered into a settlement agreement with the Debtors' largest lender, the Federal Deposit Insurance Company, as Receiver for New Frontier Bank ("FDIC-R"). This settlement allowed the Debtors to pay the FDIC-R in full, and restart the dairy operations with significantly less secured debt. The Dairy has decreased its expenses and currently operates only its small milk barn. As the economics of the dairy industry improve and the Dairy gains increased funding for operations, the Dairy intends to rebuild its herd of milk cows and fully utilize its facility.

**C.    Management**

The Dairy is a sole member LLC owned wholly by Johnson. As stated above, Johnson has over 25 years experience in the dairy and heifer replacement industry. Johnson oversees all facets of the operation, and handles the majority of the executive decisions.

The other individuals that assist with the management of the Dairy are Rodney Johnson, Phillip Johnson, Chico Contreras, and Mary Hernandez. Rodney Johnson handles the financial aspects of the Dairy, including the feed procurement. He is Johnson's son and graduated from the Monfort School of Business at the University of Northern Colorado and has a background in banking. Phillip Johnson is Johnson's brother and joined the operation over five years ago and manages the cow and heifer records program, along with other administrative issues. Chico Conteras is the primary herdsman and has been with the Dairy for 13 years. Mr. Contreras has extensive experience in the dairy heifer development and dairy herd management. Mary Hernandez manages the Dairy's scale house and reconciles feed deliveries. She has been with the Dairy for four years.

**D.     Administrative Claim Bar Date**

If the Plan is confirmed, all applications for allowance and payment of Administrative Claims, including Professional Fees, must be filed within 45 days following the Effective Date of the Plan, unless additional time is timely requested.

## IX.     PLAN FEASIBILITY

The Debtors' Plan is feasible based upon the Debtors' ability to achieve the various components of the Plan. The Debtor expects to have sufficient cash on hand on the Plan effective date to meet all payments due at that time. The balance of the payments due under the Plan will be derived from the Dairy's ongoing business operations and a new $3 million loan expected to be obtained from AgStar. The new AgStar Loan funding will be derived from Johnson's investment in new stock in the Dairy with funds obtained from borrowing against his unencumbered real property. The Dairy has now reduced costs and eliminated significant debt service, which will enable it to operate profitably with smaller milking operations. With respect to the Debtors' pre-petition debt, as discussed more fully below, the Debtors entered into a settlement agreement with FDIC-R, the Kruses, and the Bells, which resulted in a release of all the claims the parties had against one another. This eliminated more than $50 million of the Debtors' secured and unsecured debt. The Debtors have retained essential equipment contracts that benefit the Dairy operations. If the AgStar real estate loan is not restructured with the additional $1,000,000 advance and if the $2,000,000 new McFinney Agri-Finance loan does not close then any Court approval of this Disclosure Statement would be moot, and the Debtor will not proceed with the Plan unless it obtains Court approval of a revised Disclosure Statement.

**All creditors must be aware that the effectiveness of this Plan is based on the Debtors' ability to obtain and close a new $3 million loan from AgStar and McFinney Agri-Finance. While AgStar has indicated in correspondence that it is willing to make such a loan, the loan will only be made if certain contingencies are met in advance. If the AgStar Loan is not closed and funded, this Plan will not become effective and both Debtors and their assets will remain in Chapter 11 pending another alternative resolution of this case which will have to be determined at that time.**

24

Since the Debtors entered into and closed their settlement with the FDIC-R they have moved to rebuild their herd of milk cows. The Debtors are currently rebuilding the herd so that the Dairy can operate the small milking barn at its capacity. The Debtors currently have 2,400 milking cows, 1,300 bred heifers, and 400 young heifers. The Debtors have used the proceeds from the recent sale of 3000 heifers to purchase an additional 1,500 milking cows that can be brought into the milk line. In January 2010 the Dairy had approximately 2,400 cows on the milk line, and over the next 9 months, as the current heifers calve, the number of milking cows will increase until the small milking barn is at capacity of 3,500 milking cows, with 3,000 cows on the milking line.

Attached to this Disclosure Statement as Exhibit C is a projection of the Dairy's operation following confirmation of the Plan. The expense projections are much lower than the expenses of the Dairy as of the Petition Date, because they are based on the associated costs of only running the small milk barn. The income projections are based on the Dairy's current average milk production, milk prices based on Class III futures through 2011, and milk prices at a $15.50 Class III price for the remaining months. The cull and death rate for the herd is estimated to be 12% for the first 9 month of 2010, as the Dairy freshens its springers, and 36% thereafter. To increase income, the Dairy plans to sell bull calves as babies for $25 a head and raise its heifers to 5 months and sell them for 400 pound heifers at $1.25 a pound. Since the Dairy will be selling its young heifers, the projections account for the purchase of replacement cattle for cull and death loss cows beginning in April 2010. Based upon the projections, the Dairy will be able to meet all payment obligations under the Plan.

**Environmental Issues**

Johnson Dairy, LLC is operating as a non-permitted large CAFO (Concentrated Animal Feeding Operation) which it may do under Colorado Water Quality Control Commission Regulation 81. The Dairy is missing a few records of regular activities that should be kept pursuant to Regulation 81. The absence of these records can not be cured and the Dairy must make sure it keeps records going forward. A few other records, such as pond liner certifications, need to be revised to identify the pond lining material. This is a relatively minor matter.

The Dairy is also not currently in compliance with its Use-by-Special Review Permit from Weld County because it has more than 2,000 dairy cows, although the current 3,000 cows is well

below the total limit of 11,240 cattle, and the current production area exceeds the area permitted by the County. The Dairy's Second and Third Amended Use by Special Review permits were sought to correct this problem. Both have been approved by County Resolution but neither is fully in effect because the County's acceptance of the final plat depends upon the Dairy obtaining CAFO Discharge Permit coverage, which is dependant upon the Dairy's construction of a seventh pond. The seventh pond is largely completed and is currently being tested.

The Dairy's seventh pond has been constructed without a construction storm water permit from the Water Quality Control Division. It is debatable as to whether such a permit was required by the State but it was required by the Second and Third Amended Use by Special Review resolutions. This oversight can not be cured since the work is done and the impact with regard to the amendments to the special use permit are not certain.

Johnson Dairy has engaged an environmental attorney who has drafted an opinion letter in regard to Johnson Dairy's environmental status in order to meet the AgStar loan contingency. A copy of the proposed opinion letter is attached to this Disclosure Statement as Exhibit D.

## X.   RISK TO CREDITORS

This Disclosure Statement contains statements which look into the future. There is no way to determine the accuracy of these statements. The Debtors used their best efforts based upon all the information available to the Debtors in making these statements. The Debtors attempted to be conservative in their analysis. However, the Debtors believe that the Plan as proposed offers the best option for creditors. The Plan provides for approximately 50% payment of all unsecured creditors' Allowed Claims, assuming approximately $6 million in claims and $3 million in a cash distribution once the Plan is effective; as explained herein in greater detail, the principal alternative to the Debtors' reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. As indicated in the Debtors' liquidation analysis provided below, liquidation of the Debtors is highly problematic and will be the subject of delay, resolution of a number of difficult legal issues that will take time to resolve, and may result in a lower payment to unsecured creditors.

## XI.    TAX CONSEQUENCE

The Debtors are not providing tax advice to creditors or interest holders.  **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.**  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation.  Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XII.    EVENTS DURING THE CHAPTER 11 CASE

### A.    General Operations and Reduction of Herd

When the Debtors filed for relief under Chapter 11 of the Bankruptcy Code, the Dairy had 10,030 milking cows and 6000 heifers at its facility.  The Debtors were able to take advantage of a unique constellation of events during the course of the Chapter 11 case.  First, the Debtors negotiated a global settlement with the FDIC-R, Kruse and Bell in which all of the secured and lease claims could be paid off at a steep discount.  Second, the Debtors were able to take advantage of a program offered to Colorado dairies to enter into a program to liquidate their milk cow herds, as explained below, with a resulting cash payment to the dairy.  By taking advantage of these two opportunities, the Debtors were able to eliminate their greatest debt problems, obtain releases of the FDIC-R claims and the Kruse and Bell claims.  This left remaining assets free and clear of liens with the exception of those treated under the Plan and described herein.

On July 22, 2009, the Debtors filed a motion with the Court to authorize the Debtors to enter into the Cooperatives Working Together ("CWT") herd retirement program, and sell and slaughter their dairy cow herd free and clear of liens and encumbrances (the "CWT Motion").  The CWT herd retirement program is designed to remove cows from the nation's diary herds so that the supply of milk is more in line with demand.  The program pays the dairies that elect to participate in the program an amount equal to one year's worth of milk production multiplied by the dairy's bid, which

27

can be no more than $5.25 per hundredweight in two payments. The Dairy bid into the program at $5.15 per hundredweight of milk production. The Court approved the Motion, in part, and authorized the Debtor to enter into the program and liquidate its 8,709 milking cows. The Dairy received $10,149,161.00 for its participation in the program, and received an additional $4,786,154.00 in proceeds from the slaughter of its milking cows. As provided for in the CWT program, the Dairy received 90% of the funds after confirmation of the sale of cows, and will receive 10% of the funds in one year. The sale proceeds were held subject to any claimed liens pending further order of the Court. Based upon the Debtors' settlement with the FDIC-R, the remaining 10% payment is assigned to FDIC-R and most of the money received from CWT and the herd slaughter was assigned to FDIC-R in payment. The Debtors retained $1.1 million. The Dairy was not required to slaughter its herd of heifers.

On October 21, 2009, the Dairy filed a motion seeking authority to sell a portion of its heifers. The Court approved the motion, and the Dairy sold 3,000 heifers, leaving approximately 1,300 bred heifers and 400 young heifers at the Dairy. The Dairy received $1,850,000.00 net proceeds from the sale, and has used these funds to purchase approximately 1,300 head of milk cows and springers to add to the current figures. The Dairy as of April 2010, has a total of 2702 milking cows with 2515 cows on the milk line. Additionally, with the 600 head of bred heifers, the Dairy anticipates that 100 head of springers per month will be available over the next 6 months, and that as the heifers calve and are put into the dairy herd, the number of milk cows will increase to the 3000, bringing the small milk barn to capacity.

### B.    Cow Leases/Financing Agreements

The Debtors entered into several cow leases, as discussed above, which the Debtors asserted were disguised financing agreements. At the time the Debtors filed their voluntary petitions, the Bells and the Kruses were the only other parties to the cow arrangements. During the pendency of the chapter 11 cases, the Kruses and the Bells sought relief from the automatic stay and adequate protection for the cows, and the Debtor initiated an adversary proceeding against the Bells and Kruses. All claims by and between these parties have been settled and released as a result of the settlement with FDIC-R, Kruses, and Bells.

### C.    Adversary Proceeding and Settlement Agreement Between the Debtors, FDIC-R, the Kruses, and the Bells

As discussed above, the Debtors initiated an adversary proceeding in this case. The Adversary Proceeding was initiated against the Bells, the Kruses, Gregory Bell, Thissen, and NFB. In its adversary proceeding, the Debtors alleged, among other things, that NFB, and its officers engaged in illegal conduct with respect to its financing transactions with the Debtors, including their facilitation of the alleged cow lease arrangements, and that the individual participants in the cow transactions were unjustly enriched.

After months of litigating the issues, the Debtors, FDIC-R, the Bells and the Kruses entered into a settlement agreement, which was approved by the Court on November 18, 2009. Pursuant to the settlement agreement, the Debtors paid FDIC-R the following amounts in exchange for a full release of FDIC-R's claims:  the slaughter proceeds of $4,786,154, the initial CWT payment of $9,134,245.00, the deferred CWT payment of $1,014,916 plus interest, and $125,000 in culled cow proceeds. In exchange, the FDIC released all of its liens on the real and personal property of both estates, and the parties, including the Bells and the Kruses, released claims held in adversary proceedings. As a result of the settlement agreement, the Debtors were released of more than $50,000,000 in secured and unsecured debt, and the Dairy was entitled to use the remainder of its cash collateral, and $125,000.00 in cull cow proceeds. Thus, as of the filing of this Plan, the Debtors' only secured debts include, AgStar's lien, Caterpillar's, John Deere's, and AGCO's equipment agreements, and any tax liens on the real property. Additionally, the current cows at the Dairy are owned by the Dairy.

The Debtors' claims against Gregory Bell and Mr. Thissen remain pending in the adversary proceeding. These claims may be pursued by the Creditors Committee once the Plan is confirmed. The Debtors' litigation counsel has indicated he may conclude the litigation on a contingency fee basis but no decisions have been made in this regard. Numerous claims remain pending against these individuals and the prospect of actual monetary recovery may not be great. The Debtors have already given the Creditors Committee notice that the Debtors intend to abandon these claims and it will be up to the Creditors Committee to pursue them if they so desire.

### D. Examiner

Dr. Raymond Hunter was appointed as an examiner in the case, and provided recommendations regarding regular reporting requirements and future operations of the Dairy, focusing on short term recommendations to get the Dairy through May 2009 – July 2009.

## LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to a debtors' reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the debtor's assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the debtor's assets. The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities. In the cases of Johnson and the Dairy, a liquidation is problematic and a number of complex issues would have to be resolved. As will be demonstrated below, even if the Dairy could be converted or liquidated through a Plan filed by creditors, the recovery is believed by the Debtors to be substantially less than provided under the Plan and would take substantially longer to accomplish.

**Conversion to Chapter 7**

Both Johnson and the Dairy are "farmers" as that term is defined in the Bankruptcy Code. As farmers, the two Debtors' cases may not be involuntarily converted to Chapter 7. 11 USC §1112(c). This section of the Bankruptcy Code prohibits the court from converting a Chapter 11 case for a farmer to Chapter 7 unless the debtor agrees to conversion. Neither Johnson nor the Dairy will agree to conversion of their cases to Chapter 7.

**Liquidation Through Creditor Plan**

The Johnson and Dairy cases are two independent cases and have to be addressed separately. Creditors could conceivably attempt to liquidate the Dairy by filing a liquidating Chapter 11 plan. There are two major problems with such an attempt. First, the Debtors would argue that creditors can not do through a plan what they can not do by way of conversion, namely liquidate the Debtors involuntarily. This issue has been addressed by some circuit courts in the United States but there do not appear to be any reported decisions in the Tenth Circuit in which this case exists. A split of authority exists on this issue and should creditors attempt to liquidate the Dairy or Johnson through a

30

Chapter 11 plan, both Debtors would resist and pursue appeals if needed up to at least the Tenth Circuit. This process would be both time consuming and expensive for creditors. The Debtors estimate that litigating this issue from the Bankruptcy Court through the Tenth Circuit would take at least 2 years. Second, the Debtors currently have the exclusive right to pursue their plan in this case. The Debtors obtained an extension of the exclusivity period for filing a Plan through December 21, 2009 and an extension of that time for an additional 120 days provided they filed their Plan within the exclusive period which they did. Therefore, at this time, neither the creditors committee nor any creditor may file a plan.

The Johnson case is now solvent as a result of the settlement with the FDIC-R. Johnson owns substantial real property as previously described. The most significant parcel of property is the property on which the dairy is located. The dairy property is fully encumbered by the AgStar lien leaving the remaining real property free and clear. However, Johnson has little unsecured debt which primarily consists of the two claims based on guarantees of the Caterpillar and AGCO lease and claim.

The Creditors Committee has argued in pleadings that they may attempt to combine the assets of the Johnson and Johnson Dairy cases. This action is generally referred to as substantive consolidation. The Debtors do not agree that grounds exist to merge the two estates and believe that each estate has been separately maintained. The Debtors to not agree that simply because the Johnson assets have been used to support the Dairy and obtain loans to develop the Dairy that substantive consolidation can occur. The Creditors Committee believes that the Johnson real property has been used in full to support the Dairy and the Johnsons have been compensated over the past several years from the Dairy. The settlement with the FDIC-R resulted in a release of the liens that FDIC-R held against the Johnson real property, the AgStar lien remains. Despite the relationship between Johnson and the Dairy, the Debtors do not believe that grounds for consolidation exist. This is due in part to the fact that they have each been maintained as separate economic units, have separate assets and liabilities, and no grounds exist for consolidation which is not a routine creditor remedy. The current Plan avoids this argument and conflict and Dairy unsecured creditors will get the value of the Johnson assets since they will be used in part to obtain the $3 million loan that is used to pay creditors.

31

A liquidation of the Dairy case results in realization of lower proceeds from assets and greater dilution of unsecured claims as a result of an increase in unsecured debt. Based on the claims analysis attached to this Disclosure Statement as Exhibit B, the Dairy expects $6,000,929, in total unsecured debt in this Chapter 11 case. In the event of liquidation, the collateral for the Caterpillar and AGCO lease and secured claim would be liquidated at an appraised amount of $1,901,300, which would leave a deficiency claim of $773,592 which would be added to the pool of unsecured claims. The Debtors have completed a liquidation analysis which is attached to this Disclosure Statement as Exhibit D. The Debtors' liquidation analysis indicates that unsecured creditors may recover 41% on account of their unsecured claims in the Dairy Chapter 11 case. Such recovery would only occur after significant delay over litigation regarding the ability of the creditors to compel liquidation of the Debtors.

**The Debtors' Plan**

Under the Debtors' Plan the unsecured creditors are receiving a payout of $3 million dollars which assuming the claims are approximately $6 million results in payment of 50% of the claims. If creditors object to Plan confirmation and the parties litigate confirmation issues, the cost to both sides will be greater and it will make it more difficult to meet the payment obligations under the Plan. Both the Creditors Committee and the Debtors' counsel are being paid from the estate and it is the estate that is funding the payment to creditors under the Plan. All creditors are urged to vote to accept the Plan, which provides for the Debtors to continue operations and pay the unsecured creditors through a lump sum distribution of $3 million plus whatever can be recovered on account of the Avoidance Actions.

DATED: June 11, 2010

JOHNSON DAIRY, LLC

By: _____
          John Johnson, Manager

JOHN D. JOHNSON

_____

32

Kutner Miller Brinen, P.C. and Weinman & Associates, P.C. (collectively "Counsel") have acted as legal counsel to Debtors on bankruptcy matters during the Chapter 11 cases.  Counsel have prepared this Disclosure Statement with information provided primarily by the Debtors.  The information contained herein has been approved by the Debtors.  Counsel has not made any separate independent investigation as to the veracity or accuracy of the statements contained herein.

Debtors- In-Possession:

KUTNER MILLER BRINEN, P.C.                                    WEINMAN & ASSOCIATES, P.C.

By: _____                              By:_____
      Lee M. Kutner                                                  Jeffrey A. Weinman
      303 E. 17th Ave. Suite 500                                     730 17th Street, Suite 240
      Denver, CO 80203                                               Denver, CO 80202-3506
      Telephone: (303) 832-2400                                      Telephone: (303) 572-1010
      Telecopier: (303) 832-1510                                     Telecopier: (303) 572-1011
      Email:  lmk@kutnerlaw.com

33

**EXHIBIT A**
**JOHNSON UNSECURED CREDITORS**

| Creditor | Scheduled | Proof of Claim | Treatment In Plan |
|---|---|---|---|
| AGCO Finance [1] | $1,264,337.52 | $1,201,155.13 | $0.00 |
| CAT Finance [2] | $1,476,709.00 | $1,473,737.29 | $0.00 |
| GMAC | | $16,248.82 | $16,248.82 |
| North Weld County Water District [3] | | $312,402.95 | $0.00 |

Total Amount of Claims                                    $16,248.82

1. This claim is being fully paid in the Plan as a Dairy secured claim
2. This claim is being treated as an assumed equipment lease for the Dairy
3. This claim is being treated as an administrative claim of the Dairy in the Plan

**EXHIBIT A**

## EXHIBIT B
## DAIRY UNSECURED CREDITORS

| Creditor | Scheduled | Proof of Claim | Treatment in Plan |
|---|---|---|---|
| A-1 Organis, Inc. | $150,000.00 | | $150,000.00 |
| ADM | | $99,320.11 | $99,320.11 |
| AGCO Finance [1] | $1,264,337.52 | | $0.00 |
| Agland | $300,000.00 | | see below |
| Agprofessional, LLC | $10,613.08 | | $10,613.08 |
| Bay, Marvin | $55,500.00 | $55,348.86 | $55,348.86 |
| Bell, William [2] | $9,388,399.00 | $9,725,000.00 | $0.00 |
| Bovine Reproductive | $80,000.00 | | $80,000.00 |
| Brethaur, Jerrold | $32,823.34 | | $32,823.34 |
| Buderus Farms | | | $0.00 |
| Calva Products | $31,988.00 | | $20,550.00 |
| Caterpillar Financial Services Corporation [3] | | $2,947,474.58 | $0.00 |
| Colorado Equipment, LLC | | $6,665.26 | $6,665.26 |
| Commodity Specialists | | $373,996.18 | $373,996.18 |
| Dairy Authority | $153,163.23 | | $153,163.23 |
| Dairy Specialiests | $308,728.49 | $222,286.31 | $222,286.31 |
| Diamond D. Trucking | $50,000.00 | $47,988.28 | $47,988.28 |
| E-Z Pour Ready Mix | $30,301.39 | $30,257.06 | $30,257.06 |
| Essay Hay & Trucking LLC | $25,963.15 | $93,583.12 | $93,583.12 |
| Fabrizius, Louie | $35,931.00 | | $35,931.00 |
| Farm Plan | $90,000.00 | | $90,000.00 |
| Feed Management | | $1,200.00 | $1,200.00 |
| Fort Collins Feed | $23,498.50 | $23,850.98 | $23,850.98 |
| GMAC | $17,720.63 | $16,248.82 | $16,248.82 |
| Heldt, Bill | $2,978.04 | | $2,978.04 |
| High Country Enterprise | $35,000.00 | | $35,000.00 |
| Hill, Roger | $23,904.75 | | $23,904.75 |
| Hungenburg Produce | $23,200.00 | $23,200.00 | $23,200.00 |
| IBA Dairy Depot | $25,000.00 | $21,190.10 | $21,190.10 |
| Internal Revenue Service | | $1,349.49 | $1,349.49 |
| JD Heiskell | | $46,953.43 | $46,953.43 |
| John Deere Company, Inc. | | $12,142.88 | $12,142.88 |
| Johnson, Barry | $32,000.00 | $30,551.15 | $30,551.15 |
| Karlberg, Tom | $10,727.49 | $10,727.49 | $10,727.49 |
| Kruse, Daniel [2] | $4,389,454.00 | | $0.00 |
| Larson, Lelyn | $5,049.00 | | $5,049.00 |
| Laundry Specialists | | $6,954.17 | $6,954.17 |
| Luther Equipment | $79,049.75 | $154,525.15 | $154,525.15 |
| M&T Farms | $13,764.28 | $13,764.28 | $13,764.28 |
| Mason Ranch | $1,390.77 | | $1,390.77 |
| McLavey, Greg | $79,487.11 | | $79,487.11 |
| Mountain Vet | $221,645.00 | | $221,645.00 |
| Northern Feed & Barn | $512,114.99 | $500,452.16 | $500,452.16 |
| Northern Colorado Scale | $14,481.35 | | $14,481.35 |
| Olander Farms | $114,042.36 | | $114,042.36 |
| Pacific Ag | $349,739.56 | $341,254.15 | $341,254.15 |
| Public Service Company of Co dba Xcel Energy | | $30,855.17 | $30,855.17 |
| Rotharmel, Don | $25,000.00 | $89,587.60 | $89,587.60 |
| Sater, Paul | $1,951.60 | | $1,951.60 |
| Seewald, Andy | $33,555.00 | | $33,555.00 |

**EXHIBIT B**

**EXHIBIT B**
**DAIRY UNSECURED CREDITORS**

| Creditor | Scheduled | Proof of Claim | Treatment In Plan |
|---|---|---|---|
| TCC Corporation | $16,000.00 | | $16,000.00 |
| Teague Diversified | $200,000.00 | $168,540.89 | $168,540.89 |
| TLC Farms | | $841,064.22 | $841,064.22 |
| Torres, Marcos | $5,482.50 | | $5,482.50 |
| Walco | $25,000.00 | $22,603.90 | $22,603.90 |
| Wayne Lane Harvesting | $9,648.00 | $20,367.00 | $20,367.00 |
| Western Sugar Cooperative | $549,359.84 | $549,359.84 | $549,359.84 |
| Whitman Brothers | $16,782.75 | $16,692.75 | $16,692.75 |

*Total Claims*                                                                                     *$5,000,928.93*
Agland- rejection claim                                                                   *$1,000,000.00*
*Total*                                                                                                   *$6,000,928.93*

1. This is being treated as a fully secured claim under the Plan
2. This claim was released pursuant to the Settlement Agreement
3. This claim represents the total amount owed under an equipment lease, which the Debtor is assuming under the Plan

Johnson Dairy
Projections
2010

Johnson Dairy - Budget Nov 2009 - Dec 201

| | JAN 2010 Proj | FEB 2010 Proj | MAR 2010 Proj | APRIL 2010 Proj | MAY 2010 Proj | JUNE 2010 Proj | JULY 2010 Proj | AUG 2010 Proj | SEPT 2010 Proj | OCT 2010 Proj | NOV 2010 Proj | DEC 2010 Proj | YTD 2010 Proj |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MILK SALES - GROSS | 769,807.50 | 732,271.88 | 857,775.57 | 880,940.40 | 939,533.81 | 948,820.26 | 1,015,942.10 | 1,052,191.80 | 1,093,554.00 | 1,137,166.80 | 1,088,016.00 | 1,124,277.00 | 11,640,294 |
| GAIN/LOSS MILK CONTRACTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CUSTOM FEED INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| Heifer SALES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| COWS & BULLS SOLD | | | | | | 72,960.00 | 75,051.00 | 77,180.49 | 79,288.69 | 79,288.69 | 79,000.00 | 79,000.00 | 541,708 |
| GAIN/LOSS ON COWS SOLD | 13,869.00 | 14,368.50 | 14,947.50 | 15,416.33 | 15,921.00 | 16,402.50 | 16,886.48 | 17,365.61 | 44,599.89 | 44,599.89 | 44,437.50 | 44,437.50 | 303,212 |
| CALVES SOLD | 2,887.50 | 2,993.44 | 3,107.81 | 3,211.73 | 3,316.88 | 3,417.19 | 3,518.02 | 3,617.84 | 3,716.66 | 3,716.66 | 3,703.13 | 3,703.13 | 40,969 |
| CWT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CO-OP DISTRIBUTION | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| INTEREST INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| USDA MARKET LOSS ASSIST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| OTHER INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| | | | | | | | | | | | | | |
| TOTAL REVENUE | 786,555.00 | 749,633.82 | 875,869.88 | 899,568.46 | 958,771.60 | 1,041,539.95 | 1,111,397.59 | 1,150,355.75 | 1,221,159.23 | 1,264,772.03 | 1,215,150.63 | 1,251,417.63 | 12,526,122 |
| | | | | | | | | | | | | | |
| EXPENSES | | | | | | | | | | | | | |
| BEDDING | 15,000.00 | 15,000.00 | 15,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,000.00 | 15,000.00 | 15,000.00 | 85,000 |
| FEED | 382,947.50 | 364,177.79 | 441,237.59 | 478,409.54 | 494,469.66 | 470,843.73 | 513,148.96 | 532,662.23 | 544,180.22 | 558,843.50 | 524,175.00 | 538,843.50 | 5,843,709 |
| Corral Cleaning | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| LABOR Net | 100,000.00 | 100,000.00 | 105,000.00 | 105,000.00 | 105,000.00 | 105,000.00 | 110,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 1,330,000 |
| WORKERS COMP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| PAYROLL TAX | 16,000.00 | 16,000.00 | 16,800.00 | 16,800.00 | 16,800.00 | 16,800.00 | 17,600.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 212,800 |
| FACILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| FUEL & OIL | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 180,000 |
| MACH & EQUIP- PARTS/SERVICE | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 96,000 |
| MILKING SYSTEMS- CHEM SUPPLIES | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 240,000 |
| BRAND INSPECTION | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CWT | 5,115.00 | 4,827.11 | 5,573.59 | 5,611.09 | 6,022.65 | 6,043.44 | 6,462.74 | 6,680.58 | 6,930.00 | 7,161.00 | 6,930.00 | 7,161.00 | 74,518 |
| FARM HAUL - DFA | 51,159.00 | 48,271.05 | 55,735.94 | 56,110.85 | 60,226.53 | 60,434.41 | 64,627.36 | 66,805.83 | 89,300.00 | 71,610.00 | 69,300.00 | 71,610.00 | 745,181 |
| VET MED | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 240,000 |
| BREEDING | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 240,000 |
| OTHER MARKETING - DFA | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 144,000 |
| Testing & Trimming | 20,440.00 | 19,308.42 | 22,294.36 | 22,444.34 | 24,090.61 | 24,173.76 | 25,850.94 | 26,722.33 | 27,720.00 | 28,644.00 | 27,720.00 | 28,644.00 | 298,072 |
| FEES & LICENSES | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 56,000 |
| LEASE PAYMENTS - Equipment | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 18,000 |
| LEASE PAYMENT - Trucks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| PROFESSIONSAL & LEGAL SERVICES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| RENTALS- MACHINE & EQUIPMENT | 10,000.00 | 10,000.00 | 5,600.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 70,000 |
| Administrative costs | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| TRAVEL/ MEALS | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000 |
| TRUCKING | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 360,000 |
| UTILITIES | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000 |
| Other Expense | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 138,000 |
| FARM OWNERS INSURANCE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| HEALTH INSURANCE | 2,400.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| WiC Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| RE LEASE | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 57,460 |
| Trustee Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| SHORT TERM INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| LONG TERM INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |

Exhibit C

Johnson Dairy
Projections
2010

| | JAN 2010 | FEB 2010 | MAR 2010 | APRIL 2010 | MAY 2010 | JUNE 2010 | JULY 2010 | AUG 2010 | SEPT 2010 | OCT 2010 | NOV 2010 | DEC 2010 | YTD 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL EXPENSE | 726,072.50 | 707,584.37 | 797,641.45 | 830,375.82 | 842,699.45 | 822,344.60 | 873,690.00 | 908,070.97 | 923,130.22 | 904,438.50 | 918,325.00 | 906,438.50 | 10,234,942 |
| NET INCOME | 60,482.50 | 42,049.45 | 78,159.43 | 79,192.64 | 116,162.24 | 222,344.60 | 237,707.59 | 242,284.76 | 297,829.01 | 313,313.53 | 296,825.63 | 314,959.13 | 2,301,210 |
| ADD BACK DEP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| INTEREST ON LOANS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CASH AVAILBLE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| INCOME FROM CULLS | 60,482.500 | 42,049.450 | 78,159.432 | 79,192.641 | 116,162.236 | 222,244.597 | 237,707.594 | 242,284.759 | 297,829.008 | 313,313.528 | 296,825.625 | 314,959.125 | 2,301,210+ |
| Replacements Purchased | 0.00 | 0.00 | 0.00 | 51,387.75 | 53,070.00 | 54,675.00 | 56,288.25 | 57,885.37 | 148,666.28 | 148,666.28 | 148,125.00 | 148,125.00 | 866,888 |
| CASH AVAILABLE AFTER REPLACEMEN | 60,482.50 | 42,049.45 | 78,159.43 | 27,804.89 | 63,092.24 | 167,569.60 | 181,419.34 | 184,399.39 | 149,162.72 | 164,647.24 | 148,700.63 | 166,834.13 | 1,434,321 |
| Debt Service | | | | | | | | | | | | | |
| Funds from Agstar | | | | | | | | | | | | | |
| Agstar RE Loan 12.6mm @ 4% 360 mo | | | | | | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 421,080 |
| Unsec 5m @ 0% 84 mo Pmt based on price | | | 10,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 235,000 |
| Equipment Lease & pmts | | | | | | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 329,000 |
| TOTAL DEBT SERVICE | 0.00 | 0.00 | 10,000.00 | 25,000.00 | 25,000.00 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 985,080 |
| NET AFTER OPER. REPL. AND PRIN PMT | 60,482.50 | 42,049.45 | 68,159.43 | 2,804.89 | 38,092.24 | 35,415.27 | 49,265.01 | 52,245.06 | 17,008.39 | 32,492.91 | 16,546.30 | 34,679.80 | 449,241 |
| ADDITIONAL CATTLE PURCHASED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CASH BALANCE | 60,482.50 | 42,049.45 | 68,159.43 | 2,804.89 | 38,092.24 | 35,415.27 | 49,265.01 | 52,245.06 | 17,008.39 | 32,492.91 | 16,546.30 | 34,679.80 | 449,241 |
| ACCUMULATED CASH POSITION | $411,259.28 | $453,308.73 | $521,468.16 | $524,273.05 | $562,365.29 | $597,780.56 | $647,045.57 | $699,290.63 | $716,299.02 | $748,791.94 | $765,338.23 | $800,018.03 | |
| HEIFERS NEEDED FOR REPLACEMENT | 31 | 32 | 33 | 34 | 35 | 36 | 38 | 39 | 39 | 99 | 99 | 99 | |
| HEIFERS TO SELL IF NEEDED | | | | | | | | | | | | | |
| Additional Heifers or cows into herd + purch | 163 | 112 | 111 | 110 | 109 | 108 | 106 | 105 | 105 | | | | |
| LBS OF MILK PRODUCED | 5,115,000 | 4,827,105 | 5,573,590 | 5,611,085 | 6,022,653 | 6,043,441 | 6,462,736 | 6,680,583 | 6,930,000 | 7,161,000 | 6,930,000 | 7,161,000 | 74,518.1 |
| LACTATING COWS | 2,500 | 2612 | 2724 | 2834 | 2944 | 3052 | 3159 | 3265 | 3500 | 3500 | 3500 | 3500 | 37.0 |
| AVE PRODUCTION/COW | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.00 |
| DAYS IN MONTH | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 3 |
| TOTAL HERD | 3,080 | 3193 | 3315 | 3426 | 3538 | 3645 | 3753 | 3859 | 3964 | 3964 | 3950 | 3950 | 43.6 |
| % OF COWS IN MILK TANK | 81.17% | 81.81% | 82.18% | 82.72% | 83.20% | 83.74% | 84.18% | 84.61% | 88.28% | 88.28% | 88.61% | 89.61% | 85.0 |
| MILK PRICE | $15.05 | $15.17 | $15.39 | $15.70 | $15.60 | $15.70 | $15.72 | $15.75 | $15.78 | $15.78 | $15.70 | $15.70 | $15 |
| DFA Estimated Price | 14.55 | 14.67 | 14.89 | 15.20 | 15.40 | 15.50 | 15.72 | 15.75 | 15.78 | 15.78 | 15.50 | 15.50 | |
| Heifer Inventory | 1272 | 1255 | 1244 | 1237 | 1234 | 1236 | 1092 | 948 | 804 | 804 | 804 | 804 | |

Johnson Dairy
Projections
2011

**Johnson Dairy - Budget Nov 2009- Dec 201**

| | JAN 2011 Proj | FEB 2011 Proj | MAR 2011 Proj | APRIL 2011 Proj | MAY 2011 Proj | JUNE 2011 Proj | JULY 2011 Proj | AUG 2011 Proj | SEPT 2011 Proj | OCT 2011 Proj | NOV 2011 Proj | DEC 2011 Proj | YTD 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MILK SALES- GROSS | 1,124,277.00 | 1,015,476.00 | 1,124,277.00 | 1,088,010.00 | 1,124,277.00 | 1,088,010.00 | 1,124,277.00 | 1,124,277.00 | 1,088,010.00 | 1,124,277.00 | 1,088,010.00 | 1,124,277.00 | 13,237,455 |
| GAIN/LOSS MILK CONTRACTS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CUSTOM FEED INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| Heifer SALES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| COWS & BULLS SOLD | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 79,000.00 | 948,000 |
| GAIN/LOSS ON COWS SOLD | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 48,881.25 | 586,575 |
| CALVES SOLD | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 3,703.13 | 44,437 |
| CWT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CO-OP DISTRIBUTION | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| INTEREST INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| USDA MARKET LOSS ASSIST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| OTHER INCOME | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| **TOTAL REVENUE** | 1,255,861.38 | 1,147,060.38 | 1,255,861.38 | 1,219,594.38 | 1,255,861.38 | 1,219,594.38 | 1,255,861.38 | 1,255,861.38 | 1,219,594.38 | 1,255,861.38 | 1,219,594.38 | 1,255,861.38 | 14,816,46 |
| **EXPENSES** | | | | | | | | | | | | | |
| BEDDING | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,000.00 | 15,000.00 | 15,000.00 | 85,000 |
| FEED | 548,843.50 | 454,838.00 | 538,843.50 | 524,175.00 | 538,843.50 | 524,175.00 | 538,843.50 | 538,843.50 | 524,175.00 | 538,843.50 | 524,175.00 | 538,843.50 | 6,333,442 |
| Corral Cleaning | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| LABOR Net | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 1,440,000 |
| WORKERS COMP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| PAYROLL TAX | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 19,200.00 | 230,400 |
| FACILITIES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| FUEL & OIL | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 180,000 |
| MACH & EQUIP- PARTS/SERVICE | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 8,000.00 | 96,000 |
| MILKING SYSTEMS- CHEM SUPPLIES | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 240,000 |
| BRAND INSPECTION | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| CWT | 7,161.00 | 9,468.00 | 7,161.00 | 6,930.00 | 7,161.00 | 6,930.00 | 7,161.00 | 7,161.00 | 6,930.00 | 7,161.00 | 6,930.00 | 7,161.00 | 84,315 |
| FARM HAUL - DFA | 71,610.00 | 64,680.00 | 71,610.00 | 69,300.00 | 71,610.00 | 69,300.00 | 71,610.00 | 71,610.00 | 69,300.00 | 71,610.00 | 69,300.00 | 71,610.00 | 843,150 |
| VET/ MED | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 240,000 |
| BREEDING | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 12,000.00 | 144,000 |
| OTHER MARKETING - DFA | 28,644.00 | 25,872.00 | 28,644.00 | 27,720.00 | 28,644.00 | 27,720.00 | 28,644.00 | 28,644.00 | 27,720.00 | 28,644.00 | 27,720.00 | 28,644.00 | 337,260 |
| Testing & Trimming | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000 |
| FEES & LICENSES | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 56,000 |
| LEASE PAYMENTS - Equipment | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 18,000 |
| LEASE PAYMENT - Trucks | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| PROFESSIONAL & LEGAL SERVICES | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| RENTALS- MACHINE & EQUIPMENT | 10,000.00 | 10,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 70,000 |
| Administrative costs | | | | | | | | | | | | | |
| TRAVEL/ MEALS | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000 |
| TRUCKING | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| UTILITIES | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 360,000 |
| Other Expense | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000 |
| FARM OWNERS INSURANCE | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 11,500.00 | 138,000 |
| HEALTH INSURANCE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| WC Insurance | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| R/E LEASE | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 60,000 |
| Trustee Expense | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| SHORT TERM INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |
| LONG TERM INTEREST | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0 |

Johnson Diary
Projections
2011

| | JAN 2011 | FEB 2011 | MAR 2011 | APRIL 2011 | MAY 2011 | JUNE 2011 | JULY 2011 | AUG 2011 | SEPT 2011 | OCT 2011 | NOV 2011 | DEC 2011 | YTD 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL EXPENSE | 948,458.50 | 846,058.50 | 936,458.50 | 316,269.38 | 334,402.88 | 316,269.38 | 334,402.88 | 921,458.50 | 916,325.00 | 931,458.50 | 918,325.00 | 936,458.50 | 10,991.56 |
| NET INCOME | 307,402.88 | 301,002.38 | 319,402.88 | 316,269.38 | 334,402.88 | 316,269.38 | 334,402.88 | 334,402.88 | 316,325.00 | 324,402.88 | 301,269.38 | 319,402.88 | 3,824,900 |
| ADD BACK DEP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| INTEREST ON LOANS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| CASH AVAILIBLE | 307,402.875 | 301,002.375 | 319,402.875 | 316,269.375 | 334,402.875 | 316,269.375 | 334,402.875 | 334,402.875 | 316,269.375 | 324,402.875 | 301,269.375 | 319,402.875 | 3,824,900 |
| INCOME FROM CULLS | | | | | | | | | | | | | |
| Replacements Purchased | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 162,937.50 | 1,955,250 |
| CASH AVAILABLE AFTER REPLACEMEN | 144,465.38 | 138,064.88 | 156,465.38 | 153,331.88 | 171,465.38 | 153,331.88 | 171,465.38 | 171,465.38 | 153,331.88 | 161,465.38 | 138,331.88 | 156,465.38 | 1,869,650 |
| Debt Service | | | | | | | | | | | | | |
| Funds from Agstar | | | | | | | | | | | | | |
| Agstar RE Loan 12.6mm @ 4% 360 mo | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 60,154.33 | 721,851 |
| Unsec 5m @ 0% 84 mo Pmt based on price | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 300,000 |
| Equipment Lease & pmts | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 47,000.00 | 564,000 |
| TOTAL DEBT SERVICE | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 132,154.33 | 1,585.85 |
| NET AFTER OPER. REPL. AND PRIN PMT | 12,311.05 | 5,910.54 | 24,311.05 | 21,177.55 | 39,311.05 | 21,177.55 | 39,311.05 | 39,311.05 | 21,177.55 | 29,311.05 | 6,177.54 | 24,311.05 | 283,794 |
| ADDITIONAL CATTLE PURCHASED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| CASH BALANCE | 12,311.05 | 5,910.54 | 24,311.05 | 21,177.55 | 39,311.05 | 21,177.55 | 39,311.05 | 39,311.05 | 21,177.55 | 29,311.05 | 6,177.55 | 24,311.05 | 283,794 |
| ACCUMULATED CASH POSITION | 812,329.07 | 818,239.62 | 842,550.66 | 863,728.21 | 903,039.25 | 924,216.80 | 963,527.84 | 1,002,838.89 | 1,024,016.43 | 1,053,327.48 | 1,059,505.02 | 1,083,816.07 | 1,0 |
| HEIFERS NEEDED FOR REPLACEMENT | 109 | 109 | 109 | 109 | 109 | 109 | 109 | 109 | 109 | 109 | 109 | 109 | |
| HEIFERS TO SELL IF NEEDED | | | | | | | | | | | | | |
| Additional Heifers or cows into herd + purch | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| LBS OF MILK PRODUCED | 7,161,000 | 6,468,000 | 7,161,000 | 6,930,000 | 7,161,000 | 6,930,000 | 7,161,000 | 7,161,000 | 6,930,000 | 7,161,000 | 6,930,000 | 7,161,000 | 84,313.5 |
| LACTATING COWS | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | 3500 | |
| AVE PRODUCTION COW | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.0000 | 66.00 |
| DAYS IN MONTH | 31 | 28 | 31 | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | |
| TOTAL HERD | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | 3950 | |
| % OF COWS IN MILK TANK | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.61% | 88.6 |
| MILK PRICE | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15.70 | $15 |
| DFA Estimated Price | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | 15.50 | |
| Heifer Inventory | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | 804 | |

**EXHIBIT D**
**JOHNSON DAIRY, LLC**
<u>**Liquidation Analysis**</u>

  Assuming the Dairy could be liquidated, the Debtors believe the assets, liabilities, and distribution to creditors would be as follows:

ASSETS

| | | | |
|---|---|---:|---:|
| Livestock (Exhibit D-1) | | | $3,592,846.00 |
| Equipment (encumbered)[1] | | | 389,425.00 |
| Equipment (Caterpillar) | | | |
| | Value | $1,092,300 | |
| | Claim | <u>$1,473,737</u> | |
| | Net | ($ 381,437) | 0.00 |
| Equipment (AGCO) | | | |
| | Value | $ 809,000 | |
| | Claim | <u>$1,201,155</u> | |
| | Net | ($ 392,155) | 0.00 |
| Feed Inventory (Minimal) | | | |
| Cash (Offset by Current Payables | | | <u>0.00</u> |
| | | | |
| Total: | | | $3,982,271.00 |

LIABILITIES

| | | |
|---|---:|---:|
| Priority Claims | | |
|  Trustee Fee and Costs | | $150,000.00 |
| | | |
| Professional Fees (Estimated)[2] | | |
| | | |
|  Kutner Miller Brinen, P.C. | $ 50,000 | |
|  Weinman and Associates | $ 50,000 | |
|  Fairfield & Woods | $ 80,000 | |
|  Otten Johnson | $ 50,000 | |
|  Allen & Vellone | $ 50,000 | |
|  Joseph Law | $ 0 | |
|  Genske Mulder | <u>$ 15,000</u> | $295,000.00 |

---

1 The equipment is encumbered by a lien held by AgStar unless separately designated as subject to another creditor lien or lease.  The equipment valuation is based on an appraisal done by Dickensheet & Assoc. Inc. dated December 30, 2009.
2 These fees are estimates assuming there is litigation over whether or not the Debtors can be liquidated.

Other Administrative Expenses

|  |  |  |
|---|---|---|
| ICE | $100,800 | |
| North Weld Water | $117,760 | |
| Commodity Specialists | $ 40,725 | |
| Teague Enterprises | $ 40,139 | |
| North Feed and Bean | $ 66,279 | |
| | $365,703 | $365,703.00 |

Total Priority Claims                                                    $810,703.00

| | |
|---|---|
| Asset Value | $   3,982,271 |
| Priority Claims | ($810,703) |
| Less AgStar equipment lien | ($389,425)[3] |
| Balance for Unsecured | $2,782,143.00 |

Unsecured Dairy Claims

| | |
|---|---|
| Exhibit B Unsecured claims | $5,000,929.00 |
| Caterpillar and AGCO Deficiency | $773,592.00 |
| Agland Rejection Damages[4] | $1,000,000.00 |

| | |
|---|---|
| Total Unsecured Claims | $6,774,521.00 |

| | |
|---|---|
| Distribution to Unsecured | $.41 per dollar |
| | 41% percentage payoff |

---

3 This liquidation analysis assumes that in a liquidation AgStar will not be paid in full from its real estate collateral and will need to foreclose on the equipment to assist in paying its loan. This is because AgStar currently is only secured by a portion of the real estate needed to operate a dairy and therefore in a liquidation its real property collateral will sell for its value as ground only and not property on which a dairy could be legally operated.
4 Based on rejection of corn and cotton contract.

12/20/2009

### JOHNSON DAIRY LIVESTOCK LIQUIDATION ANALYSIS

| | LOCATION | HEAD COUNT | DESCRIPTION | WEIGHT | PRICE | | TOTAL |
|---|---|---|---|---|---|---|---|
| HERD | Dairy- Milk Pens | 2167 | Milk Cows | 1300-1500 | $ | 1,125.00 | $ 2,437,875.00 |
| | * Dairy- Milk Pens | 382 | 15 % sort off required to market herd | 1400 @ $.38/lb | $ | 532.00 | $ 203,224.00 |
| | | 2549 | | | | | $ 2,641,099.00 |
| | | | | | TB & Brand $12/hd | | $ (26,004.00) |
| | | | | | MYCO test herd $6/hd | | $ (13,002.00) |
| | | | | | 4% Commission | | $ (97,515.00) |
| | | | | | | | $ (136,521.00) |
| HEIFERS | Dairy | 180 | Bred Hfs 6 mo + | 1200-1300 | $ | 1,100.00 | $ 198,000.00 |
| | Dairy | 214 | Bred Hfs 4-6 mo | 1100-1200 | $ | 1,000.00 | $ 214,000.00 |
| | Dairy | 312 | Bred Hfs 1-3 mo, Confirmed | 1100 | $ | 900.00 | $ 280,800.00 |
| | Dairy | 350 | 0- 60 days Bred, Not Confirmed | 800-900 | $ | 750.00 | $ 262,500.00 |
| | Dairy | 141 | Open Cut- Hfrs | 400-750 | $ | 500.00 | $ 70,500.00 |
| | Dairy | 300 | Hfrs Calves | 250 | $ | 250.00 | $ 75,000.00 |
| | Dairy- Wean Pens | 160 | Hfr Calves | 150-175 | $ | 150.00 | $ 24,000.00 |
| | Dairy- Hutches | 250 | Hfr Calves | 50-100 | $ | 100.00 | $ 25,000.00 |
| | Dairy | 12 | Breeding Bulls | 1200-1600 | $ | 650.00 | $ 7,800.00 |
| | | 1919 | | | | | $ 1,157,600.00 |
| | | | | | TB & Brand $12/hd | | $ (23,028.00) |
| | | | | | 4% Commission | | $ (46,304.00) |
| | | | | | | | $ (69,332.00) |

$ 3,592,846.00

* Dairy herds are typically liquidated providing the buyer with a possible sort off of cows which
ranges from 15 to 20%, with the sort off cows typically marketed for beef.

Exhibit D-1